UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DOROTHY TESTAVERDE, as Administratrix of
the Estate of ALONZO TESTAVERDE, Deceased,

                                Plaintiff(s),

    -against-

UNITED STATES OF AMERICA,

                                Defendant(s).
------------------------------------------------------------------------X

PLAINTIFF'S PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Civil Action No.:
CV-05-2462 (ARR)

Plaintiff DOROTHY TESTAVERDE, as Administratrix of the Estate of ALONZO

TESTAVERDE, Deceased, by her attorneys WINGATE, RUSSOTTI & SHAPIRO, LLP

submits this Proposed Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT:

1. Decedent, Alonzo Testaverde, was born on February 7, 1931 and died on May 9, 2005 at the age of 73 years.

2. On June 25, 2004, Plaintiff Dorothy Testaverde was appointed as the Administratrix of the Estate of Alonzo Testaverde by the Circuit Court for Palm Beach County, Probate Division, State of Florida.

3. On February 28, 2001, decedent made an outpatient visit to the Veterans Administration Hospital in Brooklyn and complained of left hip pain which was worse on extension and internal rotation. He also had left hip pain with weight bearing. He was unable to recall any trauma. He was sent for bilateral hip xrays, which were performed on March 13, 2001. These x-rays were reported to be normal.

4. On April 9, 2001, decedent again presented to the outpatient department of the Veterans Administration Hospital in Brooklyn and complained of pain in the groin area of the left leg. He was noted to have chronic pain and a hip x-ray was taken, which noted no acute pathology. Tramadol was prescribed.

5. On May 5, 2001, decedent again presented to the outpatient department of the Veterans Administration Hospital in Brooklyn and made complaints of pain in the left side of the lower abdomen. He was noted to have a persistent left groin strain following a fall

several weeks earlier. He was diagnosed with a left groin strain and was prescribed Motrin for his pain.

6. On May 9, 2001, decedent again presented to the outpatient department of the Veterans Administration Hospital in Brooklyn with continuing complaints of left groin pain and left hip pain. It was noted in decedent's chart that he also had pain in the left knee which radiated down to the left foot and that there was no pain in the left gluteal region or pain along the back of the thigh. He was kept on Motrin and an appointment was made for decedent to obtain and EMG and to see a neurologist.

7. On June 8, 2001, decedent underwent an MRI of the lumbar spine to rule out a herniated disc at the L4-5 disc level. A possible hemangioma was reported at the L2 vertebral level. No disc herniations or bulges were reported. A follow up CT can was recommended with regard to the hemangioma.

8. On June 19, 2001, decedent again presented to the Veterans Administration Hospital in Brooklyn for complaints of bright red blood per rectum. He was seen by Dr. Pasquariello who noted that decedent was complaining of very bad pain the anterior thigh and shin. She ordered a CT scan and was awaiting an EMG.

9. On June 22, 2001, decedent underwent a CT scan of the lumbar spine to rule out a hemangioma at the L2 vertebral body v. metastasis. The study was reported to reveal a hemangioma at the L2 vertebral body.

10. On July 27, 2001, decedent visited with a neurologist at the Veterans Administration Hospital in Brooklyn. The neurologist noted that the left leg pain was resolved with Vioxx; that an EMG was negative; that the pain was probably arthritic in nature, and; that neurology treatment be discontinued.

11. On October 31, 2001, decedent again presented to the Veterans Administration Hospital in Brooklyn and made complaints of persistent pain in the left leg. It is noted in the medical chart that decedent complained of lancinating pain originating in the superior aspect of the left knee and radiating upwards toward the groin approximately 10 cm anteriorly. He also complained of pain in left groin which radiated downward. The pain was reported to be worse at night and relieved by sitting with the left buttock off of the chair or by walking. Decedent was diagnosed with left hip and knee arthritis and he was prescribed nortryptiline. A bone scan and a rehabilitation evaluation were ordered.

12. On November 9, 2001 a three phase bone scan was performed on decedent at the Veterans Administration Hospital at Brooklyn. The bone scan reported stated that a linear area of increased radionuclide activity is seen in the left proximal femur just below the surgical neck extending distally. Further radiologic evaluation was advised to rule out other etiology.

13. On December 6, 2001, decedent again presented to the Veterans Administration Hospital

at Brooklyn. The records for this visit indicate that decedent has been having excruciating pain the left hip, thigh and knee since a fall nine months ago; that the pain is unpredictable with no precipitating factors; that the pain is sometimes excruciating while sitting and then relieved by walking around. The physical examination was negative. Decedent was diagnosed with possibly having myofascial pain and that psychosocial factors cannot be ruled out.

14. On December 14, 2001 decedent made his first visit to a physical therapist at Veterans Administration Hospital at Brooklyn. The therapist noted decedent's complaints of left knee, thigh and posterior hip pain with limited exercise tolerance secondary to pain.. Active and passive range of motion was performed as tolerated.

15. On December 19, 2001, decedent was seen by Dr. Pasquariello at the Veterans Administration Hospital at Brooklyn. It was noted that decedent continued to complain of left knee and hip pain radiating to the groin as well as thigh pain. It was noted that the pain worsened when he was in bed at night and walking relieves the pain. The results of the bone scan and the lumbar MRI and were determined by Dr. Pasquariello to be non-diagnostic. Decedent was prescribed Percocet for pain; was referred for an MRI of the hip to evaluate for possible small fracture, avascular necrosis or inguinal hernia, and; was referred to a rheumatologist for evaluation of possible osteoarthritis and injection therapy. Decedent was also seen by a physical therapist on December 19, 2001, who noted decedent's complaints of more pain in the left groin area and left anterior thigh area. It was noted that decedent had very little exercise tolerance in the left lower extremity and still presented with much left lower extremity pain. Decedent was treated with a moist hot pack and with range of motion.

16. On January 13, 2002, decedent presented to the emergency room of the Veterans Administration Hospital at Brooklyn with complaints of pain in the left anterior and lateral thigh.

17. On January 14, 2002, decedent was admitted to the Veterans Administration Hospital at Brooklyn with complaints of intractable left hip pain. It was noted that he has been complaining of pain in the left groin, left hip radiating to the left thigh and left knee which has been gradually worsening. The pain was noted to become unbearable in the last two weeks. An MRI of the hips was performed on January 14, 2002, the report of which stated an impression as follows: "Distal part of the trochanter and the subtrochanteric region of the left femur, increased marrow signal is noted. This probably represents marrow edema probably related to old trauma." Defendant has stipulated (see Joint Pretrial Order) that it departed from accepted standards of medical care in the interpretation of this study in that radiologic abnormalities of decedent's left femur were not recorded or reported.

18. During the January 14, 2002 admission, decedent was seen by Dr. Pasquariello on January 15, 2002. She noted that the decedent's pain was out of proportion to the physical findings. She also notes that the decedent had tachycardia and wan appearance;

that he is usually a vital man with significant energy and meticulous personal appearance; that he appeared drawn, fatigued and more anxious than usual.

19. On January 17, 2002 an x-ray of the left hip was performed. The reported impression was "The linear lucency at the trochanteric and subtrochanteric region of the left femur probably represents a fracture with correlation with the prior MRI study.

20. During the January 14, 2002 admission, no radiologic studies were performed of the left femur despite decedent's complaints of left leg pain. Decedent was discharged on January 25, 2002.

21. On January 29, 2002, decedent was seen by an orthopedist at the Veterans Administration Hospital at Brooklyn. Decedent made similar complaints of left groin and leg pain. Decedent's radiologic results were reviewed and he was diagnosed with left hip pain secondary to left hip trochanteric bursitis and left gluteal myofascitis/weakness.

22. On January 30, 2002, decedent was seen by a rheumatologist (Dr. Deana Lazaro) at the Veterans Administration Hospital at Brooklyn. Reports of decedent's prior radiologic studies were reviewed and decedent was diagnosed with bursitis. It was noted that the radiology reports noted a left hip fracture but Dr. Lazaro indicated, "however, patient's symptoms may not be due to this." Decedent was administered a steroid injection in the left hip area.

23. On March 19, 2002 decedent received a second steroid injection in the left hip area at the Veterans Administration Hospital at Brooklyn. It was noted that the effects of the steroids lasted until March 15, 2002 and that he has been using Vioxx and Tylenol daily without much relief. Decedent made complaints of sciatic pains radiating from the left buttock to the groin to the back of the knee. Pain was also noted to be radiating to the left anterior thigh. Vioxx was discontinued and a trial of Tylenol and Tramadol was started.

24. On March 27, 2007 decedent again visited the Veterans Administration Hospital at Brooklyn. He complained that Tramadol was not effective in alleviating his pain and that the last steroid injection did not work.

25. On April 10, 2002 decedent again visited the Veterans Administration Hospital at Brooklyn. He again complained of pain in the left leg.

26. On April 16, 2002 decedent presented to the emergency room of the Veterans Administration Hospital at Brooklyn and complained that the analgesic regimen prescribed by the rheumatologist for his pain is ineffective.

27. On April 17, 2002 decedent telephoned the Veterans Administration Hospital at Brooklyn and complained of left hip pain. It was noted that decedent was intolerant of opioid medications which produce confusion, hallucinations and nausea.

28. On April 30, 2002 decedent telephoned the Veterans Administration Hospital at Brooklyn and complained of back pain going down to the groin, leg and knee.

29. On May 15, 2002, decedent again presented to the Veterans Administration Hospital at Brooklyn with complaints of persistent pain in the left leg. A pain management consult was requested, and it was recommended that he continue Tylenol.

30. On May 29, 2002, decedent again presented to the Veterans Administration Hospital at Brooklyn and complained of being up for the past two days in pain. He relayed that Dr, Lazaro said that "there is nothing else they can give me." He spoke with Dr. Pasquariello over the telephone, who ordered a Lidoderm patch and advised to obtain an appointment with rheumatology for another steroid injection.

31. On June 12, 2002, decedent again presented to the Veterans Administration Hospital at Brooklyn. He stated that the Lidocain e5% patch alleviated some of his pain. He was also taking Tylenol 1000mg p.o. every 6 hours.

32. On June 20, 2002, Dr. Pasquariello noted that the medications were ineffective in treating his pain. Dr. Pasquariello noted that she was going to prescribe for one month of Vioxx.

33. On June 26, 2002, Dr. Pasquariello noted that decedent had a "sub-optimal response" to Vioxx. Dr. Pasquariello noted that on July 11, 2002, Mr. Testaverde hoped to obtain another steroid injection.

34. On July 2, 2002 decedent presented to the emergency room of the Veterans Administration Hospital at Brooklyn and was admitted until for complaints of dizziness, shortness of breath and palpitations. He also complained of leg, back and groin and hip pain.

35. On July 10, 2002 decedent received another steroid injection in the left hip area. On July 11, 2002 decedent still complained of pain in the right posterior buttock region radiating laterally and down his thigh despite the injection. X-rays of the left hip and lumbosacral spine were ordered. Decedent was discharged on July 12, 2002.

36. On July 24, 2002 decedent presented to the rheumatology clinic of the Veterans Administration Hospital at Brooklyn again with complaints of left hip pain radiating to the groin region. The pain was described as 9/10 in intensity, that he was unable to sleep and that he was in distress. He was referred to the orthopedic department and a repeat MRI of the hip was ordered to rule out avascular necrosis. Oxycodone and robaxin were prescribed.

37. On July 30, 2002 decedent presented to the rheumatology clinic of the Veterans Administration Hospital at Brooklyn complaining that he lost ten pounds in the last two to three weeks and that he lost his desire to eat. It is noted that he was upset because it took awhile for his pain to be addressed.

38. On August 14, 2002 it is noted in decedent's chart from the Veterans Administration

       Hospital at Brooklyn that decedent's daughter called from Florida and advised that decedent was having hallucinations from the oxycodone.

39. On August 20, 2002 another MRI of the left hip was performed at the Veterans Administration Hospital at Brooklyn. The reports stated the impression as follows: No avascular necrosis in the right and left femoral heads. The trochanteric and subtrochanteric fracture on the left have healed in the present study. No marrow edema is noted in the right and left femoral heads. Defendant has stipulated (see Joint Pretrial Order) that it departed from accepted standards of medical care in the interpretation of this study in that radiologic abnormalities of decedent's left femur were not recorded or reported.

40. On August 22, 2002 decedent visited the orthopedic clinic at the Veterans Administration Hospital at Brooklyn and he reported that he had no relief with his pain medication or physical therapy. He was diagnosed with osteoarthritis and was referred to pain management and was advised to continue rehabilitation.

41. On August 27, 2002 decedent made his initial visit to the pain management clinic at the Veterans Administration Hospital at Brooklyn. It is noted that decedent was "always complaining of the pain on his left femur." He was diagnosed with left hip pain probably secondary to old fracture. He was restarted on Oxycontin 10 mg for pain relief.

42. On September 5, 2002 decedent again visited the pain management clinic at the Veterans Administration Hospital at Brooklyn. It is noted that the patient stated that his pain has not improved much. Percocet was started for pain in addition to oxycodone.

43. On September 17 2002 decedent underwent a steroid injection of the sacroiliac joint at the pain management clinic of the Veterans Administration Hospital at Brooklyn.

44. On September 24 2002 decedent made another visit to the pain management clinic at the Veterans Administration Hospital at Brooklyn. It is noted that decedent still complained of pain in the left low back with radiation to the posterior aspect of the thigh and that the pain to the front of the thigh to the knee has become more prominent. It is noted that oxycodone only gives him temporary pain relief. Decedent was started on a Duragesic patch for pain. Oxycodone was discontinued.

45. On September 26, 2002 decedent again visited the pain management clinic at the Veterans Administration Hospital at Brooklyn. It is noted that decedent was still in pain and that the Duragesic patch is not working for him as much as it should. Decedent was advised to restart Oxycontin 10mg.

46. On October 2, 2002 decedent visited the cardiology clinic at the Veterans Administration Hospital at Brooklyn. It is noted that his back and his leg are his real problem, that he is going to the pain clinic but it is not really working for him. This was decedent's last visit to the Veterans Administration Hospital at Brooklyn.

47. During decedent's entire course of treatment from February 2001 through October 2002 at the Veterans Administration Hospital at Brooklyn no focal radiologic imaging of the decedent's left femur was performed despite persistent complaints of hip, groin and leg pain.

48. On December 18, 2002 decedent saw Dr. Nicholas Dang, a specialist in Physical Medicine and Rehabilitation in Boca Raton Florida. Decedent's chief complaint was dysfunction of ambulation and activities of daily living secondary to low back, left buttock and left leg pain. Dr. Dang notes that decedent experienced moderate to severe low back pain with radiation to the left buttock, left groin and the left anterior thigh to stop at the knee. Sometimes the pain would radiate down the anterior leg but not down to the ankle or foot. The pain is described as stabbing with an intensity of 8 or 9 out of 10. Dr. Dang made several recommendations: to continue Oxycontin and Percocet; to see an internist and cardiologist, and: to see Dr. Nathaniel Lowen, a spine surgeon. Additionally, Dr. Dang planned to ask Pinecrest Rehabilitation Hospital to evaluate decedent for a possible inpatient pain program of two weeks duration.

49. On January 9, 2003 decedent visited with Dr. Nathaniel Lowen, an orthopedic spine surgeon in Boca Raton, Florida. Decedent's daughter reported a 35 pound weight loss to Dr. Lowen. It is noted by Dr. Lowen that decedent describes the pain to be predominantly in the groin and that it radiates from the anterior thigh to his knee and into the shin. Decedent described it as a sharp, constant pain at times feeling like a toothache, at time have a pins and needles sensation and numbness and tingling. Decedent stated that he has difficulty sleeping and his walking is limited to about 5 or 10 feet. He is able to go from the couch to the bathroom in his house and that is about it. Decedent stated that his legs feel weak when he tries to walk and has been using a motorized wagon recently. Dr. Lowen noted decedent's weight to be 126 lbs. (whereas his weight was 160+ lbs. while he was receiving treatment at the Veteran's Administration Hospital during the years 2001-2002). Dr. Lowen performed a physical examination and reviewed the reports of the previous radiologic studies. Dr. Lowen diagnosed lumbar radiculopathy and low back pain. He recommended an Internal Medicine physician and an MRI of the lumbar spine.

50. From January 12, 2003 to January 25, 2003 decedent was admitted to Pinecrest Rehabilitation Hospital in Delray Beach, Florida for a comprehensive rehabilitation program including physical therapy, occupational therapy, psychology and nursing care. On January 22, 2003 x-rays of the hips and femur were performed. The report of the femoral x-ray indicated that there was a broad-based 10-14 cm medial femoral diaphyseal periosteal reaction with associated cortical destruction. Malignancy was of primary concern. Further evaluation with MRI was recommended. A bone scan was performed on January 23, 2003 indicating intense increased uptake along the proximal and midshaft of the left femur corresponding to the lytic destructive process noted on plain film. Decedent was discharged from Pinecrest on January 25, 2003 with a diagnosis of malignant osteosarcoma of the left femur. Decedent was recommended to see an oncologist and orthopedic oncologist.

51. On January 28, 2003, decedent visited with Dr. Allaaddin Mollabashy, a musculoskeletal oncologist at the University of Miami School of Medicine. Dr. Mollabashy recommended an incisional biopsy and possibly prophylactic nailing based on frozen section evaluation

52. Decedent was admitted to Cedars Medical Center in Miami, Florida from February 11, 2003 to February 17, 2003 under the care of Dr. Mollabashy. During the admission an incisional biopsy of the left femoral diaphysis was undertaken. Frozen section was indeterminate. The final pathology report for this biopsy indicated a malignant epithelial

neoplasm and the possibility of a primary adamantinoma should be clinically investigated.

53. Decedent was admitted to Cedars Medical Center in Miami, Florida from March 3, 2003 to March 17, 2003. During this admission decedent underwent an intercalary resection of the left femoral diaphysis and left femoral allograft reconstruction with long Gamma nail fixation performed by Dr. Mollabashy. Pathologic evaluation of the left leg tumor revealed adamantinoma, 14 x 3 cm in size. During this admission decedent developed a bleeding aneurysm at the proximal left popliteal artery which caused a hematoma in the left leg. The aneurysm was embolized using coils.

54. Following his discharge from Cedars Medical Center on March 17, 2003 he was admitted to a nursing home (Manor Care) and began physical therapy.

55. Decedent first visited Dr. Mollabashy postoperatively on March 24, 2003. At this time he was ambulating with a walker and partial weight bearing. He had a resolving thigh hematoma.

56. Decedent again visited Dr. Mallabashy on March 31, 2003, who notes that decedent was doing well at that time. The thigh incision and hematoma were resolving. He was instructed to advance his physical therapy to 25lb weight bearing and gait training.

57. Decedent again visited Dr. Mollabashy on April 7, 2003. He notes that decedent wished to be discharged from Manor care; that his surgical incision was healed; that his hematoma was resolving; that he is to be discharged from Manor Care and that he will continue physical therapy at home; and that he can use 50% weight bearing.

58. Decedent returned to Dr. Mollabashy on May 5, 2003. He notes that decedent is doing well; that he is ambulating with 50% weight bearing; that he has minimal discomfort; that the surgical wound is healed; that he is neurovascularly intact; that there is minimal residual hematoma. He counseled decedent to advance to 75% weight bearing. He was given a prescription for physical therapy, quadriceps and hamstring strengthening and gait training.

59. Decedent returned to Dr. Mollabashy on July 14, 2003. He notes that decedent was ambulating with a walker and weight bearing as tolerated; that he has intermittent discomfort that requires percocet for relief and involves the distal aspect of his left femur and anterior knee. X-rays of the left femur revealed the allograft to be in appropriate position with early healing of the allograph junction distally and minimal healing proximally. Decedent was advised by Dr. Mollabashy to wean himself from the walker to a four prong cane. He was diagnosed with osteoarthritis in the left knee.

60. Decedent returned to Dr. Mollabashy on August 11, 2003. He notes that decedent had pain along the posterior aspect of his left thigh incision; that he ambulates with a walker; that he continues to use narcotics for pain relief. His physical examination and x-rays were unchanged from prior visits. Dr. Mollabashy advised decedent that the radiographic appearance of the reconstruction is appropriate and that there is no evidence of recurrent disease.

61. Decedent returned to Mollasbashy again on September 15, 2003. It is noted that decedent's pain has subsided significantly and that he is not as reliant on narcotic analgesics. He has advanced from ambulating with a walker to four pronged cane. His physical examination revealed no evidence of interval change. Radiographs revealed new bone formation at the distal osteotomy site and minimal evidence of formation at the proximal site.

62. On December 11, 2003 decedent visited with Dr. Thomas Temple at the University of Miami Orthopedic Clinic, who took over for Dr. Mollasbashy at the clinic. Decedent complained of excruciating pain and discomfort in his left lower extremity. Radiographs were performed demonstrating mild callous formation both proximally and distally at the allograft host junction sites. There was micromotion of the distal interlocking screw through the long gamma nail. Dr. Temple was unsure what was causing decedent's pain but considered recurrence of his tumor and the possibility that the allograft did not heal to the host bone. Dr. Temple prescribed anti-inflammatory medication and requested that decedent return in six weeks.

63. On January 15, 2004 decedent returned to Dr. Temple and complained of persistent pain about his distal knee/thigh. X-rays of the femur were performed which demonstrated healing of the proximal allograft at the host junction site, with a persistent lucent line over the distal allograft-host junction. Dr. Temple believed that this possibly represented a non-union of the distal allograft.

64. A MRI of the left femur and a bone scan performed at Boca Raton Community Hospital on February 10 and 12, 2004, respectively, were suggestive of recurrent tumor in the distal femur.

65. Decedent was admitted from March 1, 2004 to March 10, 2004 to Cedars Medical Center under the care of Dr. Temple because of non-union of his distal allograft and a soft tissue mass in the left distal thigh. Dr. Temple was concerned that decedent could have an infection and/or recurrence of the tumor in his thigh. On March 5, 2004 Dr. Temple performed an open biopsy of the left leg. Pathologic evaluation demonstrated a recurrence of the adamantinoma in the left distal femur. Following the biopsy, Dr. Temple explained the options to decedent and his family. These options included (1) do no treatment with the consequence of advancement of his disease and metastasis; (2) left total femur replacement; (3) above the knee amputation. Among these options, Dr. Temple recommended amputation. Decedent and his family wished to obtain a second opinion before proceeding. Thereafter, decedent sought such second opinion and came under the care of Dr. James Wittig, an orthopedic oncologist in New York City.

66. Decedent was scheduled to undergo reconstruction of the left femur with Dr. Wittig in or about April 2004 but prior to the scheduled surgery he was admitted to Westchester Medical Center on April 7, 2004 with complaints of chest pain. A cardiac catheterization was performed on April 12, 2004 which revealed diffuse disease. He was diagnosed with a non Q wave myocardial infarction. He was discharged on April 13, 2004.

67. Decedent was again admitted to Westchester Medical Center from April 27, 2004 to May 3, 2004 and from May 6, 2004 to May 9, 2004 for cardiac reasons. Decedent died on April 9, 2004 of cardiac causes.

## CONCLUSIONS OF LAW

1. The Court concludes that defendant United States of America, through its agents, servants and employees at the Veterans Administration Hospital at Brooklyn was negligent and departed from accepted standards of medical care in failing to perform focal radiologic imaging of decedent's femur during the course of care from February 28, 2001 through October 2, 2002 in light of decedent's persistent complaints of hip, groin and leg pain.

2. The Court concludes, as stipulated by the parties in the Joint Pretrial Order dated June 20, 2008, that Defendant was negligent and departed from accepted standards of medical care with respect to the interpretation of decedent's hip MRI's on January 14, 2002 and August 20, 2002 in that Defendant failed to record or report radiologic abnormalities in the left femur in these studies.

3. The Court concludes that if Defendant had properly reported the radiologic abnormalities in decedent's left femur that were evident in the hip MRIs of January 14, 2002 and August 20, 2002, this should have, under accepted medical practice then existing, been followed up by performing focal radiologic imaging of decedent's left femur.

4. The Court concludes that if focal radiologic imaging of decedent's left femur were performed during the period of February 28, 2001 through October 2, 2002 it would have, more likely than not, revealed evidence of malignancy as later described in decedent's January 2003 radiologic studies of the femur, which would have then resulted in a biopsy of the left femur.

5. The Court concludes that, more likely than not, a biopsy of decedent's left femur performed during the period of February 28, 2001 through October 2002 would have revealed and diagnosed adamantinoma of the left femur.

6. The Court concludes that the negligence and departures from accepted medical practice committed by Defendant in failing to order radiologic imaging of decedent's left femur during the course of treatment from February 28, 2001 to October 2, 2002 were a substantial factor leading to a delay in the diagnosis and treatment of decedent's femoral adamantinoma.

7. The Court concludes that decedent's persistent pain in his left hip, groin and leg beginning in February 2001 and continuing until the resection of the femur on March 36 2003 was a result of the left femoral adamantinoma.

8. The Court concludes that the departures from accepted medical practice committed by Defendant and the resultant delay in the diagnosis and treatment of the adamantinoma was a substantial factor leading to growth and extension of the adamantinoma.

9. The Court concludes that the departures from accepted medical practice committed by Defendant and the resultant delay in the diagnosis and treatment of the adamantinoma was a substantial factor leading to decedent's injuries, including prolonged physical and emotional pain and suffering, disability, debilitation; loss of enjoyment of life, need for

more extensive resection surgery, recurrence of the cancer and need for treatment of the recurrence.

Dated: New York, NY
      March 16, 2009

                          Yours, etc.,

                          _____
                          Jason M. Rubin (JR 0734)
                          WINGATE, RUSSOTTI & SHAPIRO, LLP
                          Attorneys for Plaintiff(s)
                          420 Lexington Avenue, Suite 2750
                          New York, NY 10170
                          (212) 986-7353