UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                             )

DOROTHY TESTAVERDE, as Administratrix )
of the Estate of ALONZO TESTAVERDE,    )            DEFENDANT'S PROPOSED
                                         )            FINDINGS OF FACT
                     *Plaintiff*,       )            <u>AND CONCLUSIONS OF LAW</u>
                      *v.*           )
                                           )

UNITED STATES OF AMERICA,         )            Civil Action No. 05-CV-2462
                                         )
                                         )            (Ross, J.)
                     *Defendant*.      )
-----------------------------------------------------------x

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, defendant the

UNITED STATES OF AMERICA, by its attorney, BENTON J. CAMPBELL, United States

Attorney for the Eastern District of New York, ORELIA E. MERCHANT and CHARLES P.

KELLY, Assistant United States Attorneys, of counsel, submits the following findings of fact

and conclusions of law.

## **<u>BACKGROUND</u>**

1.     Plaintiff Dorothy Testaverde, as Administratrix of the Estate of Alonzo

Testaverde, brought this action against the United States under the Federal Tort Claims Act, 28

U.S.C. §§ 1346 (b), 2401, 2671 <u>et seq.</u>, claiming negligence and malpractice arising out of

medical care and treatment rendered to decedent, Alonzo Testaverde, at the Veterans

Administration New York Harbor Healthcare System Brooklyn Campus ("Brooklyn VA") from

in or about February 28, 2001, to approximately October 2002.  Plaintiff Claims that the United

States, its agents, servants and employees, failed to timely diagnose cancer (adamantinoma) in

decedent's left femur.

2.     More specifically, plaintiff claims that a radiologist employed by defendant failed

to diagnose and report radiologic abnormalities in decedent's MRI studies on January 14, 2002 and August 20, 2002.  Plaintiff claims that a proper interpretation of these studies would have resulted in further testing, including plain x-rays and biopsy, which would have resulted in an earlier diagnosis of decedent's cancer.

3.      Additionally, plaintiff claims that the clinicians who were rendering care to plaintiff's decedent at the Brooklyn VA for left hip and leg pain from February 2001 through October 2002 were negligent in failing to properly work-up decedent's complaints of leg and hip pain, which resulted in a delay in the diagnosis of cancer.

4.      Specifically, plaintiff claims that defendant's failure to timely diagnose decedent's cancer resulted in the following injuries: (1) decedent's prolonged pain and suffering, (2) need for more extensive surgery and (3) recurrence of the cancer.

5.      The issue to be determine by the Court is whether there was a breach in the standard of care that was the proximate cause of conscious pain and suffering and/or economic losses to plaintiff, which were caused by defendant's acts or omissions.  Addressed chronologically, the Court must determine:

(1)      Whether any damages in the form of conscious pain and suffering and/or economic losses were suffered by plaintiff's decedent as the proximate result of defendant's acts or omissions from February 28, 2001, the date alleged in the complaint as plaintiff's decedent's first presentation to the Brooklyn VA for complaints of left hip pain, to January 14, 2002, the date of plaintiff's decedent's first MRI of the left hip;

(2)      Whether any damages, in the form of conscious pain and suffering and/or

2

economic losses were suffered by plaintiff's decedent as the proximate result of defendant's acts or omissions from January 14, 2002, the date of the plaintiff's decedent's first MRI of the left hip, to August 20, 2002, the date of plaintiff's decedent's second MRI of the left hip, including defendant's failure to report abnormalities;

(3)     What damages, in the form of conscious pain and suffering and/or economic losses were suffered by plaintiff's decedent as the proximate result of defendant's acts or omissions from August 20, 2002, the date of plaintiff's decedent's second MRI of the hip, including defendant's failure to identify and report abnormalities, to January 24, 2003, the date of plaintiff's decedent's MRI of the left femur that revealed abnormalities that were identified and led to further testing and a biopsy which resulted in the diagnosis of adamantinoma of the left femur; and

(4)     Whether any damages, in the form of conscious pain and suffering and/or economic losses were suffered by plaintiff's decedent as the proximate result of defendant's acts or omissions from January 24, 2003, the date of plaintiff's decedent's MRI of the left femur that revealed abnormalities that lead to further testing and a biopsy which resulted in the diagnosis of adamantinoma of the left femur, to May 9, 2004, the date of plaintiff's death caused by a heart attack.

6.     The United States responds that the care provided to plaintiff's decedent from February 28, 2001, to January 14, 2002, was fully reasonable, appropriate, and within the

3

standard of care, as was all care rendered from January 14, 2002, to November 26, 2002, with the exception of a failure or report abnormalities on radiological studies taken on January 14, 2002, and August 20, 2002.

7.  Defendant further maintains that even had alleged abnormalities on radiological studies taken on January 14, 2002, been reported, the appropriate follow-up on such abnormalities would not have resulted in  the diagnosis of adamantinoma.

8.  Defendant maintains that to the extent that the reporting of the alleged abnormalities on radiological studies taken on August 20, 2002, would have resulted in follow up imaging studies that may have resulted in the diagnosis of adamantinoma, there was only a delay of five months, to January 2003, in the diagnosis of plaintiff's decedent's adamantinoma.

9.  Defendant further maintains other than the treatment for the period August 2002 to January 2003, treatment would not have changed if all care had meet the standard of care.

10.  Defendant further maintains that plaintiff's decedent's prognosis and outcome would not have been altered by an earlier diagnosis of the adamantinoma in his left femur.

11.  Defendant further maintains that any delay in diagnosis had no impact on the likelihood of recurrence, or any actual recurrence that took place.

12.   Damages to plaintiff's decedent, if any, were sustained without any negligence, fault, or want of care on the part of defendant with respect to those periods prior to August 20, 2002, and after January 2003.

13.  Damages to plaintiff's decedent resulting from surgical removal of the adamantinoma and recurrence of the adamantinoma, if any, would have occurred regardless of, and despite the absence of, any breach of the standard of care by defendant or delay in diagnosis.

4

14.     Other than pain and suffering between August 2002 and January 2003, the injuries and damages alleged in the complaint were neither the result of any failure to meet the standard of care nor were they actually or proximately caused or contributed to by any negligence, wrongful act, or omission of an agent, servant or employee of defendant.

## FINDINGS OF FACT

A.     **Medical History**

1.     **Treatment Rendered by the Brooklyn VA**[1]

1.     Alonzo Testaverde suffered from a long history of significant heart disease.  (US 2007). This was demonstrated by his ongoing cardiology monitoring at the Brooklyn VA.  (US 1913-2006, 2010-2016, 2103-2112, 2122-2131).

2.     Notably, he suffered from atrial flutter.  (US 2007).

3.     He had two or three pillow orthopnea.  (US 2007).

4.     He had suffered a myocardial infarction in 1993 and was maintained on Coumadin anticoagulation.  (US 2007).

5.     He received a total of five cardiac medications and revascularization of his heart had been recommended.  (US 2007).

6.     On February 28, 2001, Mr. Testaverde was examined for at the Primary Care Clinic ("PCC") of the Brooklyn VA for a routine follow-up visit.  (US 2007-2009).  He complained of pain in his left hip.  Id.  This was mechanical in nature, exacerbated by internal rotation.  Id.  He was unable to recall any trauma, and also had pain with weight bearing.  Id.

---

[1]  See Joint Exhibits B and C submitted herewith.

7.      On March 30, 2001, Mr. Testaverde was seen at the Emergency Room ("ER") of the

Brooklyn VA.  (US 2017-2018).  He complained of pain in his left hip and that he could

not lift his leg.  Id.  He was prescribed Percocet and instructed to follow-up with his

primary care physician.  Id.

8.      On April 9, 2001, Mr. Testaverde was seen at the ER of the Brooklyn VA.  (US 2020-

2021).  He complained of pain in the groin area of his left leg.  (US 2020).  He was noted

to have chronic pain and a hip x-ray was taken, which noted no acute pathology.  (US

2021).  He received the standard evaluation with appropriate history, physical

examination and plain radiographs.  Id.    Management with Tramadol was undertaken.

Id.

9.      On May 6, 2001, Mr. Testaverde was treated in the ER of the Brooklyn VA.  (US 2024).

He complained of left groin strain subsequent to a fall several weeks prior.  Id.  He was

scheduled for a follow-up with his primary care physician.  Id.

10.     On May 9, 2001, Mr. Testaverde was examined at the PCC of the VA,  (US 2025-2026).

He complained of groin pain since a "slip fall onto buttocks last month."  (US 2025).  He

also complained of pain in left knee that radiates down the left foot.  Id.  Dr. Pasquariello

prescribed Motrin and ordered an EMG with a neurological evaluation.  Id.

11.     On May 11, 2001, Mr. Testaverde was examined at the Neurology Clinic of the Brooklyn

VA.  (US 2028).  He complained of pain from his groin to his ankle.  Id.  He denied that

pain was due to an injury but stated that he fell once after leg pain started and sustained

an injury to his left buttock.  Id.  The neurology evaluation concluded that he suffered

from left sciatica with spondylosis and L-4, L-5 radiculopathy.  Id.  He was prescribed

Motrin for pain, an MRI of the left spine was recommended, and he was instructed to return in three weeks.  Id.

12.    On June 8, 2001, an MRI of the left spine was taken.  (US 2159-2160).  Possible hemangioma, but metastases could not be ruled out.  A CT scan with attention to L2 vertebral body was recommended.  Id.

13.    On June 13, 2001, Dr. Pasquariello ordered a follow-up CT scan.  (US 2031).

14.    Subsequently, visits on June 14, 2001, and June 19, 2001, to neurology and medicine confirmed radiculopathy and back pain as his focal complaints.  (US 2031-2032).

15.    On June 19, 2001, Mr. Testaverde was examined at the Brooklyn VA.  (US2032).  He complained of bright red blood in his rectum.  Id.  Dr. Pasquariello noted that he stated that he was still taking Motrin for pain in his lower back and buttocks that started after a fall in early March.  Id.  He also stated that the pain was better in the groin but still very bad in the anterior thigh and shin.  Id.

16.    On June 22, 2001, a CT scan was taken.  (US 2157-2158).  The findings were evidence of a hemangioma in the L2 vertebral body.  Id.

17.    On June 25, 2001, Mr. Testaverde was examined in the PCC of the Brooklyn VA.  (US 2034-2037).  He responded well to a physical therapy program and indicated that his back pain was "80% better" and he felt well enough to resume daily walking. (US 2036)  He was taking Motrin for pain, but switched to Vioxx because of his recent history of gastrointestinal bleed.  (US 2036).

18.    In July 2001,  a neurologic evaluation, including nerve conduction studies performed, demonstrated abnormalities in the ipsilateral left peroneal posterior tibial distributions,

7

consistent with sciatic nerve neuropathy.  (US 2033 - 2034).  There was no

electrodiagnostic left lumbar radiculopathy.  Id.

19.    On July 27, 2001, he was examined at the Neurology Clinic of the Brooklyn VA.  (US

2037).   It is noted that he is taking Vioxx and feels much better.  Leg pain was noted to

be arthritic in nature and as resolved.  Id.

20.    October 31, 2001, Mr. Testaverde was examined at the PCP of the Brooklyn VA.  (US

2045-2048).  At this time his examination of the extremities found no evidence of tumor.

Id.  He had no atrophy and no evidence of localized problems relative to the lower

extremity.  Mr. Testaverde complained of recurring left back, leg and knee pain, and

stated that Vioxx was no longer effective.  (US 2045).  His pain medication was switched

to Nortryptiline, and to follow-up on the persistent pain, a bone scan and rehabilitation

were recommended.  (US 2048).

21.    On November 9, 2001, the bone scan was obtained.  (US 1269, 2152-2153).

22.    On November 21, 2001, Mr. Testaverde called Dr. Pasquariello and indicated that he was

agitated about his continuous leg pain and said that the pain medication offered little

relief.  (US 2048-2049).

23.    On November 26, 2001, Dr. Pasquariello called Mr. Testaverde to discuss findings from

his November 9th bone scan.  (US 2049).

24.    On December 6, 2001, Mr. Testaverde was seen at the Rehabilitation Clinic of the

Brooklyn VA.  (US 2049-2051).  He complained of excruciating pain in his leg, thigh and

knee which he stated started about nine months ago after a fall.  (US 2049).  Dr. Cai was

consulted in physical and rehabilitation medicine.  (US 2051).  Dr. Cai noted that all

8

provocative test of the hip and knee and intervening areas were negative.  Id.  Dr. Cai

described Mr. Testaverde's pain as vague and inconsistent and that psycho-social factors

could not be ruled out.  Id.  The conclusion was that his symptoms were inconsistent and

that he was suffering from a myofascial pain syndrome.  Id.  Physical therapy was

initiated.  Id.

25.     On December 14, 2001, Mr. Testaverde's was examined at the Pain Management and

Rehabilitation Clinic ("PMR") of the Brooklyn VA.  (US 2051-2053).  Normal strength

in the local muscles of the thigh was notable.  Id.  There was tenderness in the

suprapatellar region, but none was noted in the proximal or medial thigh.

26.     On December 19, 2001, a bone scan was obtained to assess Mr. Testaverde's ongoing

complaints of left/hip/back/groin/thigh pain.  (US 2051-2054).  The bone scan showed a

linear increase in uptake in the proximal femur extending in the femoral neck and distal

to it.  Additional areas of degenerative arthritis were identified in the shoulders and knees.

Id.  This bone scan picture was reported as typical for a linear stress fracture.  Id.  Dr.

Pasquariello requested an MRI.  Id.  Dr. Pasquariello also requested a rheumatology

evaluation and considered alternative proximal groin etiologies such as a sub-clinical

hernia.  Id.

27.     January 13, 2002, plaintiff presented to the ER of the Brooklyn VA and was admitted.

(US 2055).  He complained of "unbearable hip pain."  Id.   The admission note indicated

that Mr. Testaverde saw Dr. Vas, a neurologist at SUNY Brooklyn, who "found nothing

wrong."  Id.  He had a prescription for Neurontin from Dr. Vas which he had not filled.

Id.  He complained that he had been unable to sleep for several days, and that pain was

9

worse when he is recumbent and alleviated by standing or walking.  Id.  Plaintiff stated

that he was also relieved by lying directly on his side applying pressure on the hip.  Id.

28. On January 14, 2002, an MRI was taken which revealed linear lucency at the trochanteric

region and subtrochanteric area in the left femur.  (US 2149-2151).  The impression was

that it probably represented a fracture with correlation of prior MRI study.  Id.  Mild

degenerative arthritis of the right and left hip joints are also noted.  Id.  There are vascular

calcifications.  Id.

29. On January 17, 2002, Mr. Testaverde received an orthopaedic consultation with Dr.

Rosas.  (US 2077).  Mr. Testaverde complained of pain on weight bearing.  Id.  Dr. Rosas

noted full range of hip motion with tenderness in the greater trochanter and no other

signs.  (US 2084-2085).  On January 19, 2002, Dr. Schwazbard was consulted and

recommended internal fixation of a suspected stress fracture and that non-weight bearing

be taught.  Id.

30. On January 18, 2002, the rehabilitation medicine consultation by Dr. Sanz and attending

Dr. Hadnoud noted the abnormality in the left hip MRI (1/14/02) which showed increased

marrow signal in the distal aspect of the trochanter extending to the subtrochanteric area

with marrow edema.  (US 2078).  The impression of the bone scan done in November

2001 and the impression of the MRI of the lumbar spine done in June 2001 were both

noted.  (US 2078).  The assessment was left hip pain secondary to possible old trauma or

degenerative disc changes.  (US 2080).  The treatment plan included starting physical

therapy and orthopedic therapy.  Id.

31. Later that day, January 18, 2002, Mr. Testaverde told a resident that he slept for a long

10

time during the night and that his pain medications were working and his pain is much

controlled. (US 2080).

32.    On January 21, 2002, Mr. Testaverde stated that his pain was well controlled, and he was

able to sleep through the night.  (US 2085).

33.    On January 22, 2002, the crisis department of the Brooklyn VA was called because Mr.

Testaverde attempted to leave the hospital against medical leave. ( US 2086-2087).  After

repeated explanations and reasoning by medical personnel, he agreed to stay and wait for

the orthopedics consult.  (US 2087) However, on January 24, 2002, he was discharged

with instructions to follow-up in orthopedics and rehabilitation as an outpatient.  (US

2091-2093).

34.    On January 29, 2002, Mr. Testaverde was evaluated by Dr. Cai.  (US 2094-2097).  He

complained that his pain had worsened and was principally in the back and to the left

groin, but also extended to the kneecap in the leg. (US 2094).  He described his pain level

as 2-3 on a scale of 1 to 10.  (US 2095).  Focally, it was most tender over the greater

trochanter and groin and no masses or lymph noted.  (US 2094-2095).  There was nothing

to call attention to the subtrochanteric or femoral shaft areas.  Id.

35.    On January 30, 2002, Mr. Testaverde was evaluated in the Rheumatology Clinic of the

Brooklyn VA.  (US 2097-2100).  Dr. Lazaro diagnosed left trochanteric bursitis and

performed a steroid injection.  (US 2100).

36.    This was reportedly effective and it was noted in the cardiology note of February 13,

2002,  that Mr. Testaverde stated that he was "much better after the injection," and on

February, 14, 2002, the next day, it was noted that the pain resolved after the injection.

11

(US 2101).

37.  On March 19, 2002, Mr. Testaverde was seen in the Rheumatology Clinic of the Brooklyn VA.  (US 2112-2114).  He complained of left leg pain.  Id.  The exact etiology was unclear and it was noted that there were many possibilities that existed for the pain. Id.  Mr. Testaverde receive another steroid injection.  Id.

38.  On March 27, 2002, at a Pharmacy Anticoagulation Clinic follow-up, Mr. Testaverde stated that Tramadol was not effective in alleviating his pain.  (US 2116).

39.  On April 10, 2002, Mr. Testaverde returned to the Anticoagulation Clinic of the Brooklyn VA for a follow-up.  (US 2118-2119).  He complained of pain in his left leg and stated that he was seeing a chiropractor.  Id.  It is noted that he was instructed to stop taking Ibuprofen and restart Tylenol for pain relief.  Id.

40.  On April 11, 2002, Mr. Testaverde called the VA nurse's help line complaining of severe back pain. (US 2116).

41.  On April 15, 2002, Mr. Testaverde presented in the ER of the Brooklyn VA.  (US 2120-2121).  He complained that his pain mediation was not working and requested an injection.  Id.  He was instructed to follow-up with his primary care physician and given Tylenol #3 to take that night at bedtime (US 2121).

42.  On April 17, 2002, Dr. Pasquariello returned Mr. Testaverde's telephone call regarding the recurrence of left hip pain.  (US2121-2122).  Dr. Pasquariello noted that he was intolerant of opioid medications which produce confusion, hallucinations, and nausea, and that nonsteroidal anti-inflammatory drugs (NSAIDS) could not be used because he was on coumadin.  (US 2122).  Dr. Pasquariello prescribed Tramadol and Tylenol.  Id.

She noted that he was scheduled to undergo elective cardioversion the next week.  Id.

43.    On April 30, 2002, Mr. Tesatverde called the VA nurse help line complaining of severe
pain in the back, legs, groin, and knee.  (US 2128).   He was advised to change sleeping
position, to sleep on a firm mattress and continue taking his medication, and follow up if
there were no improvements.  Id.

44.    On May 15, 2002, Mr. Testaverde presented to the Primary Care Clinic of the Brooklyn
VA for routine follow- up visit.  (US 2131-2135).   He complained that the last steroid
has worn off and he would like to be evaluated by pain management.  Id.  He stated that
he was unable to tolerate rehabilitation therapy and that he was getting relief with extra
strength Tylenol.  Id.  Dr. Pasquariello noted that Mr. Testaverde was tolerant of Opiods
and Tramadol, but he had a GI bleed on Motrin and pedal edema and increased blood
pressure with Vioxx.  Id.  Acupuncture was recommended.  Id.

45.    On May 29, 2002, Mr. Testaverde complained of being up for the past two days in pain.
(US 2138).  Mr. Testaverde spoke with Dr. Pasquariello, who ordered a Lidoderm patch.
In addition, an appointment for rheumatology was made for another steroid injection.
(US 2139).

46.    On June 12, 2002, at a follow-up appointment in the Anticoagulation Clinic of the VA,
Mr. Testaverde stated that the Lidocain 5% patch alleviated some of his pain.  (US 2141).
He also reported that he had been taking Tylenol p.o.100 mg every 6 hours since his last
appointment.  (US 2142).

47.    On June 20, 2002, Dr. Pasquariello noted that Tylenol was ineffective in treating Mr.
Testaverde's pain.  (US 2146).  Dr. Pasquariello noted that she was going to prescribe

"one month of Vioxx 25 mg after his blood Chem 7 testing."  Id.

48.    On July 2, 2002, Mr. Testaverde was admitted to the hospital for dizziness and

palpations. (US 1654-1903, 1907-1911).  He was treated for his atrial flutter rhythm.  Id.

49.    On July 10, 2002, Mr. Testaverde was evaluated for left trochanteric bursistis. (US 1784,

1778-1780).

50.    On July 11, 2002, Mr. Testaverde complained of pain in the back and left side of the

thigh.  (US 1770).  It was recommended that he undergo L-S spine and left hip x-rays.  Id.

He was given Tramadol and Tylenol.  Id.  A hip x-ray and spine lumbosacral x-ray noted

no fractures and no significant degenerative changes.  (US 1670-1672).  The diagnosis

was back pain with history of left hip fracture.  Id.

51.    On July 15, 2002, Mr. Testaverde was discharged with follow-up appointments in

Coumadin, Cardiology and Primary Care Clinics.  (US 1654-1667).

52.    On July 24, 2002, Mr. Testaverde was evaluated in the Rheumatology Clinic with

complains of left hip pain, radiating to groin region, not related to positioning.  (US 1618-

1623).  An MRI and orthopedic consult was ordered.  (US 1618).  Mr. Tesaverde was

also given Oxycodone cr 20 mg.  Id.

53.    On August 20, 2002, an MRI was taken.  (US 1904).  The impression was no avascular

necrosis in the right and left femoral heads.  Id.  The trochanteric and subtrochanteric

fracture on the left had healed.  Id.  No marrow edema was noted in the right and left

femoral heads.  Id.

54.    On August 22, 2002, the orthopedic surgeon noted that the pelvis/hip x-ray revealed some

arthritis.  (US 1600).  The MRI of the hip from August 20, 2002, was pending.  Id.  The

14

impression was osteo-arthritis in the left hip.  Id.

55.  On August 27, 2002, Mr. Testaverde received an anesthesiology pain management consult.  (US 1596-1598).   The primary pain diagnosis was: left hip pain probably secondary to old fracture, and Oxycontin, 10 mg, was restarted.  Id.

56.  On September 5, 2002, Mr. Testaverde presented to the Anesthesiology Pain Management Clinic of the Brooklyn VA.  He complained that his pain had not improved much. (US 1578).  Percocet was started, and he was also prescribed Oxycontin.  Id.  It was noted that he would be referred to the Coumadin Clinic for evaluation to determine if his Coumadin could be temporarily switched to enable the administration of a steroid injection.  Id.

57.  On September 17, 2002, Mr. Testaverde underwent a steroid injection of the sacroliliac joint. (US 1566).

58.  On September 24, 2002, Mr. Testaverde presented to the Anesthesiology Pain Management Clinic of the Brooklyn VA.  (US 1562-1564).  He complained of pain in the left low back with radiation to posterior aspect of the thigh and that it seemed that pain to the front of the thigh to the knee had become more prominent.  Id.  He was taking Oxycontin and Oxycodone which he stated gave him temporary pain relief.  Id.  He was started on a Duragesic Patch and told to continue Oxcondone and discontinue Oxycontin. (US1564).

59.  On September 26, 2002, Mr. Testaverde was evaluated by Dr. Hedayatinia at the Anesthesiology Pain Management Clinic of the Brooklyn VA.  (US 1556-1558).  He complained that he was still in pain and that the patch was not working for him as it

15

should.  (US 1556).  Oxycontin was restarted in addition to the patch.  Dr. Hedayatnia noted that he would re-evaluate Mr. Testaverde for spinal injections on October 8, 2002, after his INR.  Id.

60.    On October 8, 2002, Mr. Testaverde was evaluated at the Anesthesiology Pain Clinic of the Brooklyn VA.  (US 1544-1546).  He complained that he received little relief from pain despite taking 25 mcg of Fentanyl patch and Oxycontin 10 mg and Oxcodone.  (US 1544).  He stated that he only gets 2-3 hours of sleep due to pain.  Id.  He indicated that he was relocating to Florida.  Id.

61.    On October 17, 2002, Mr. Testaverde receive a steroid injection.  (US 1514-1516, 1530-1534).

62.    On October 27, 2002, Mr. Testaverde received another steroid injection. (US 1492-1496)

63.    On November 26, 2002, Mr. Testaverde was evaluated at the Anticoagulation Clinic of the Brooklyn VA.  (US 1428-1438).  This was his last visit to the Brooklyn VA for medical treatment. Id.  He indicated that he was moving to Florida the day after Thanksgiving.  (US 1428).

## 2.    Treatment Rendered by Other Medical Providers

64.    On January 9, 2003, Mr. Testaverde was examined at the Florida Back Institute.[2] (US3516-3527).   His chief complaint was back and left leg pain.  He described that the pain began after a fall in March of 2001, and that over the last one year and nine months, it has progressed slowly.  (US 3521).  He described the pain to be predominantly in the groin and radiating from the anterior thigh to his knee and into the shin.  Id.  He described

---

[2]  See Joint Exhibit E, US3516-3527, submitted herewith.

16

it as a sharp, constant pain, having pins and needles sensation and numbness and tingling. The pain is worse with activities and improved with rest.  Id.  He stated that he has difficulty sleeping with it and causes poor sleep.  Id.  He also stated that his walking is limited, and his is back pain is an achy, intermittent pain, at time worse with activities and improved with rest.  Id.  He reported that he was currently taking Oxcontin 20 mg twice per day, taking Percocet as needed, and also using a Lidoderm patch.  Id.  Dr. Lowen's impression was lumbar radiculopathy and low back pain.  (US 3522).  Recent weight loss was noted as concerning, but Dr. Lowen indicated that the weight loss was possibly because of the narcotic use.  Id.  He recommended an evaluation by an internal medicine doctor and an MRI of his lumbar spine.  Id.

65.   On January 22, 2003, Mr. Testaverde was evaluated by Dr. Lowen at the Pinecrest Rehabilitation Hospital.[3]  (US 3564-3569).  Dr. Lowen noted that the MRI of Mr. Testaverde's lumbar spine dated January 19, 2003, revealed no significant spinal evidence of disc herniation.  (US 3566).  His impression was significant painful left femur without radiographic diagnosis of nerve root compression.  Id.  While he initially thought that Mr. Testaverde had lumbar radiculitis, Dr. Lowen noted that he thinks that Mr. Testaverde possibly has a left femur abnormality.  Id.  Dr. Lowen recommended an x-ray of his left femur, an MRI of the left femur, and medical evaluation for his weight loss to be sure that it is not just related to his Oxycontin use and loss of appetite.  Id.

66.   On January 28, 2003, Mr. Testaverde was examined by Dr. Mollabashy at the University of Miami, Department of Orthopaedics & Rehabilitation.  (US 3561).  Mr. Testaverde

_____

[3]  See Joint Exhibit G, US 3564-3569, submitted herewith.

17

stated that his left hip pain was throbbing and burning.  Id.   The pain is noted to be located in the medical aspect of his left thigh and groin and radiates from there to his buttock.  Id.  He complains that the pain keeps him from sleeping at night, and is partially relieved by Percocet.  Id.  It is noted that an AP pelvis of the left hip dated January 22, 2003, revealed a destructive lesion in the proximal medial left femoral diaphysis with significant cortical modeling, reactive knee bone formation, and motheater appearance. The length of the lesion is approximately 18 cm.  (US 3562).  An MRI dated January 24, 2003, revealed a lesion in the medial aspect of the left proximal femoral metaphysis.  Id. There is significant cortical disruption and aberrant marrow edema signal within this region.  Id.  The differential diagnosis included metastatic carcinoma, myeloma, and more remotely, adamantinoma.  Id.   Staging studies were ordered, and it was noted that an incisional biopsy and possible prophylactic nailing based on frozen section evaluation would be scheduled.  Id.

67.    On January 29, 2003, Mr. Testaverde was evaluated at the VA Deerfield Beach Community Based Outpatient Clinic in Florida ("Miami VA").[4]  (US 631-634).  He reported that an x-ray of his left femur showed a lytic lesion, bone tumor in the left proximal femur.  (US 3631-3634).  He also had a bone scan and MRI that were suggestive of a malignant process and identified proximal diaphyseal periosteal reaction. Id.  A biopsy was scheduled at the University of Miami.  Id.

68.    On February 6, 2003, Mr. Testaverde returned to the Miami VA for a follow up visit.

_____

[4]  See Joint Exhibit H, US 3570-3638, submitted herewith.  From January 29, 2003, to February 20, 2004, Mr. Testaverde continued to receive follow-up treatment related to his hyperlipidemia, hypertension, diabetes, and coronary artery disease at the Miami VA.

(US 3628).  It was noted that Mr. Testaverde stated that he had a general pain level of 5 on a scale of 1 to 10.  Id.

69.  On February 20, 2003, at the Miami VA, Mr. Testaverde received gait training with a walker, and a walker was issued.  (US 3627-3628).

70.  On February 25, 2003, at the University of Miami, Mr. Testaverde was diagnosed with an adamantinoma of the left femur.  (US 3557).

71.  On March 6, 2003, Mr. Testaverde underwent an intercalary allograft reconstruction and long gamma nailing at Cedars Hospital in Miami.  (Joint Exhibit A, 60-737, 2253-3501).  This proceeded uneventfully, and he did relative well despite some depression due to his prolonged recovery and rehabilitation time.  Id.

72.  On March 24, 2003, March 31, 2003, April 7, 2003, May 5, 2003, July 14, 2003, August 11, 2003, and September 15, 2003, Mr. Testaverde returned for a follow-up examination by Dr. Mollabashy at the University of Miami. (US 650-658).  With each visit, his pain subsided significantly, and by September 15, 2003, he was no longer reliant on narcotic analgesics.  (US 650).  He advanced from ambulating with walker assistance to four-pronged cane assistance.  Id.  He was instructed to follow-up in three months for a serial clinical evaluation as well as a lateral radiograph of the left femur.  Id.

73.  On October 16, 2003, Mr. Testaverde was treated at the Miami VA as a scheduled follow up.  (US3616).  He complained of pain in his legs at a level of 5 on a scale of 1 to 10.  Id.

74.  On December 11, 2003, Mr. Testaverde was examined by Dr. Temple at the University of Miami Hospital for complaints of pain and discomfort with both activity and rest in his

left lower extremity.[5]  (US 648).  He complained that the pain is present in the hip as well as the knee region.  Id.  He stated that he took narcotic analgesics for his pain and discomfort and that there was a period of time where he was doing reasonably well and was making progress, but more recently, he has had increased pain, not associated with swelling.  Id.  Dr. Temple noted that Mr. Testaverde's post operative course had been complicated by a large hematoma that slowly resolved.  Id.  Dr. Temple did not feel that he had a recurrence of his tumor.  Id.  He indicated that he reviewed the pathology report from the wide excision and the distal margin was not close.  Id.  It was over 3.5 cm. away from the tumor.  Id.  Dr. Temple recommended repeat radiographs of the left femur, to include hip and knee.  (US 649).

75.  On January 15, 2004, Mr. Testaverde was examined by Dr. Temple at the University of Miami Hospital for complaints of pain about his distal thigh/knee region and pain with both activity and rest in his left lower extremity.  (US 646-647).  He complained that the that he was unable to function adequately because of the discomfort.  (US 646).  Dr. Temple noted that his radiographs demonstrated healing of the proximal allograft at the host junction site, with persistent lucent line over the distal allograft-host junction.  Id.  He recommended that he undergo bone grafting and possible supplementation of the site with plate and screws.  (US 647).

76.  In March 2004, Mr. Testaverde was admitted to the University Hospital of Miami for a biopsy, and a recurrent adamantinoma of the left femur was diagnosed.  (US 644-645).  Treatment recommendations included amputation of the leg above the knee and total

---

[5]  See Joint Exhibit A, US 60-737, 2253-3501, submitted herewith.

femoral replacement.  <u>Id</u>.  Mr. Testaverde sought a second opinion.  <u>Id</u>.

77.     On May 9, 2004, while awaiting surgery at Westchester Medical Center, Mr. Testaverde

died of a heart attack. [6]  (US 4059).

**B.     Opinion of Defendant's Medical Expert - John H. Healey, M.D., F.A.C.S.,
         Chief of Orthopaedic Surgery & Vice-Chair of Surgery (Education),
         Memorial Sloan-Kettering Cancer Center**

78.     The care and treatment rendered to Mr. Testaverde by physicians at the Brooklyn VA was

reviewed by John H. Healey, M.D., F.A.C.S.

79.     Dr. Healey is the Chief of Orthopaedic Surgery and the Vice-Chair of Surgery

(Education) at Memorial Sloan-Kettering Cancer Center.  He is also a Professor of

Orthopaedic Surgery at Weill Medical College of Cornell University.   Dr. Healey has

over 25 years of experience in orthopaedic medicine.

80.     Dr. Healey is qualified as an expert in orthopaedic medicine and surgery.  His specialty is

the treatment of bone cancer.  Dr. Healey has extensive experience and knowledge of the

standard of care in the medical community for diagnosis and treatment of bone cancer,

and specifically for adamantinomas.

**1.     Prior to the radiological study taken on August 20, 2002,
         Defendant Was Treated Within the Standard of Care**

81.     Dr. Healey opines with a reasonable degree of medical certainty that Mr. Testaverde was

treated at all times within the standard of care, with the exception of the failure to report

abnormalities on radiological studies taken on January 14, 2002, and August 20, 2002, as

he is not a radiologist.

_____

[6] <u>See</u> Joint Exhibit I, US 3639-4059, submitted herewith.

82.    Further, Dr. Healey opines with a reasonable degree of medical certainty that even had

there been a deviation of the standard of care with regard to a failure to report

abnormalities on the January 14, 2002 radiological studies, the likelihood of diagnosis of

plaintiff's decedent's adamantinoma would not have necessarily been made any sooner

given his other clinical symptoms and studies and the rarity of adamantinomas.

83.    Further,  Dr. Healey opines with a reasonable degree of medical certainty that prior to

August 20, 2002, imaging studies and clinical abnormality or focal change did not

suggest a tumor of the femur.

84.    Further, Dr. Healey opines with a reasonable degree of medical certainty that prior to

August 20, 2002, decedent's signs and symptoms pointed toward a more proximal

problem either of the hip such as joint arthritis, trochanteric bursitis, sacroilitis, or sciatica

associated with L-4, L-5 radiculopathy.   The only lesion that was identified was an

incidental finding at L-2.  The bone scan abnormality on the December 19, 2001 study

extending into the femoral neck clearly was independent of the femoral shaft lesion. It

may well have represented stress fracture and was the basis of the surgical

recommendation for internal fixation of the hip.  The non-operative management was a

reasonable alternative in that situation without a clear cut fracture line present on imaging

studies.  The marrow edema in the proximal femur was nonspecific.  This certainly is

consistent with linear stress fracture and Dr. Healey has observed stress fractures in the

absence of a clearly demarcated fracture line many times.

85.    Dr. Healey opines with a reasonable degree of medical certainty that Mr. Testaverde had

sciatica and he was treated for sciatica; he had trochanteric bursitis, and he was treated for

22

tronchanteric bursistis; he had arthritis, which is synosatis, and presented in both sides and he was treated for this.  Everything that he was treated for at the Brooklyn VA, he had and these were correct diagnoses.

86.  Dr. Healey opines with a reasonable degree of medical certainty that there is no evidence for any deviation from the standard of care by physicians at the Brooklyn VA in the clinical evaluation of Mr. Testaverde or subsequent followup.

87.  Dr. Healey opines with a reasonable degree of medical certainty that to the extent that alleged radiolgical findings from the August 20, 2002, MRI of the left hip were not reported, such findings if reported would have resulted in follow up imaging studies that may have resulted in the diagnosis of adamantinoma.

**2.    To the Extent that the Alleged Abnormalities on the August 20, 2002, MRI of Mr. Testaverde's Left Hip Would Have Resulted in Diagnosis of the Adamantinoma, the 5 Month Delay of Diagnosis, from August 20, 2002, to January 2003, Did Not Alter the Surgical Options and Outcome**

88.  Dr. Healey opines with a reasonable degree of medical certainty that limb sparing treatment of plaintiff's decedent's adamantinoma required a wide excision whether it was diagnosed in August 2002, or January 2003, and that the surgical option and outcome would not have been altered by a diagnosis five months earlier.  Any delay in diagnosis from August 2002, to January 2003, had no impact on the necessity for a wide excision.

89.  Dr. Healey opines with a reasonable degree of medical certainty that plaintiff's decedent's prognosis and outcome would not have been altered by an earlier diagnosis of the adamantinoma in his left femur.

3.    **To the Extent that the Alleged Abnormalities on the August 20, 2002, MRI of Mr. Testaverde's Left Hip Would Have Resulted in Diagnosis of the Adamantinoma, the 5 Month Delay of Diagnosis, from August 20, 2002, to January 2003, Did Not Increase the Likelihood of Any Recurrence**

90.    Dr. Healey opines with a reasonable degree of medical certainty that any delay in diagnosis from August 2002, to January 2003, had no impact on the likelihood of recurrence, or any actual recurrence that took place.

4.    **Explanation of Dr. Healey's Opinion**

91.    The diagnosis of adamantinoma of the femur is extraordinarily rare.  It is the rarest of bone tumors.

92.    Adamantinomas are found most commonly in the tibia.

93.    Adamantinomas are seen in the femur in only approximately 1-2 % of malignant bone cancers.

94.    There are approximately 2,000 bone cancers a year in the United States; so nationally, there are at most 20 adamantinomas found in the femur per year.

95.    Adamantinoma would not be in the differential diagnosis for a lesion in a patient Mr. Testaverde's age.

96.    In Dr. Healey's review of all adamantinoma cases in all of the academic medical centers of New York over a 50 year period, he found no cases resembling this in any fashion.

97.    The lesion itself is a low grade sarcoma which is often multifocal, meaning there are multiple unconnected sites of disease.  Resection is generally associated with a cure.

98.     Metastases are rare and indeed this patient did not suffer from any distant relapse.

99.    The treatment is wide excision for a lesion such as this occupying the proximal femoral diaphysis and extending to the subtrochanteric area.  The appropriate treatment was a

24

wide excision of the lesion and suitable reconstruction.  This could have been accomplished by keeping the hip and performing an intercalary allograft bone replacement, or resecting the hip and proximal femur, and reconstructing with a proximal femoral replacement.  Either a reconstruction with allograft or prosthesis would be the suitable treatment.

100.   Dr. Healey opines with a reasonable degree of medical certainty that Mr. Testaverde's care in this regard was totally appropriate and within the standard of care.

101.   Tumor recurrence may occur despite apparent wide excision.  The multifocal nature of the disease is most often responsible for this.

102.   Treatment of the recurrence with repeat excision and reconstruction was the only limb sparing option for this patient and once again the management was appropriate.

103.   Based on Mr. Testaverde's cardiac history, he was not a good candidate for major oncologic and orthopaedic reconstructive surgery.

104.   Dr. Pasquariello's assessment was entirely appropriate and with in the standard of care given the nature of reported symptoms and signs and studies.

105.   To a reasonable degree of medical certainty, these are Dr. Healey's opinions of the facts related to this case.  (See supra, ¶¶81-104).

## DISCUSSION AND CONCLUSIONS OF LAW

**A.**    **Elements of a Medical Malpractice Claim**

106.    Under the FTCA, the Government is liable for the torts of its employees in the same

manner and to the same extent as a private party, and that liability is determined "in

accordance with the law of the place where the act or omission occurred."  28 U.S.C. §

1346(b); see Molsof v. United States, 502 U.S. 301, 305 (1992).

107.    The administrative claim is an essential jurisdictional requirement preliminary to the

commencement of litigation.  28 U.S.C. § 2672(a).  Plaintiff filed an SF-95 with the

appropriate agency within two years of the alleged injury.

108.    The events in question occurred at the Brooklyn VA.  Therefore, the substantive law of

the State of New York is applicable with respect to both liability and damages.

109.    To establish a claim of medical malpractice under New York law, a plaintiff must prove

(1) that the defendant breached the standard of care in the community, and (2) that the

breach proximately caused the plaintiff's injury.  Arkin v. Gittlreson, 32 F.3d 658, 664

(2d Cir. 1994).  New York law further provides that expert medical opinion is required to

make out both of these elements.  See Milano by Milano v. Freed, 64 F.3d 91, 95 (2d Cir.

1995).

110.    New York law imposes liability on a physician for an injury to his patient resulting from

the want of the requisite knowledge and skill, or the omission to exercise reasonable care,

or the failure to use his best judgement.  Wilson v. United States, 613 F.Supp. 1322,

1325-26 (E.D.N.Y. 1985); Pepe v. United States, 599 F.Supp 798, 802 (E.D.N.Y. 1984).

See also Sitts v. United States, 811 F.2d 736, 739-40 (2d Cir. 1987).

111.    The standard of care for physicians in New York was established in 1898, in <u>Pike v. Honsinger</u>, 155 N.Y. 201, 49 N.E. 760 (1898).  That standard requires that a physician exercise a "reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices."  <u>Id.</u>, 155 N.Y. at 209, 49 N.E. at 760.

112.    The plaintiff must prove his claim by a preponderance of the credible evidence.  <u>Shepard v. United States</u>, 811 F.Supp. 98, 103 (E.D.N.Y. 1993).

113.    The United States may not be held to a stricter standard of care than would apply to a private defendant in New York under like circumstances.  28 U.S.C. § 1346 (b).  Nor is the United States subject to strict liability.  <u>Laird v. Nelms</u>, 406 U.S. 797, 802-03 (1972).

114.    As the New York Court of Appeals repeatedly has held, in determining whether medical malpractice has occurred, "[a] physician is bound only to have and to exercise competent skill in treating a patient."  <u>Benson v. Dean</u>, 232 N.Y. 52, 55 (N.Y. 1921) (citing <u>Pike v. Honsriger</u>, 155 N.Y. 201 (N.Y. 1898).  A doctor is not liable merely because a procedure or treatment does not yield a good result.  <u>Jimerson</u>, 2003 WL 25190 at *2; <u>Perez v. United States</u>, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999).  Similarly, a mere error of medical judgment or a difference of opinion is not sufficient to form the basis for liability.  <u>Jimerson</u>, 2003 WL 25190 at *2; <u>Matosic v. Gelb</u>, 647 N.Y.S.2d 781, 782 (1st Dept. 1996); <u>Jaques v. State</u>, 127 Misc. 2d 769, 771 (N.Y. Ct. Cl. 1984) (citing <u>St. George v. State</u>, 283 App. Div. 245 (3d Dept. 1954) <u>aff'd</u> 308 N.Y. 681 (N.Y. 1954))

115.    The alleged acts of negligence herein were performed by professional medical personnel employed by the Veterans Health Administration of the Department of Veterans Affairs.

Pursuant to 38 U.S.C. § 7316, the United States shall be liable for the negligence or malpractice of its physicians and other specified medical personnel acting within the scope of their employment in or for the Veterans Health Administration.

116.   The issue to be addressed is that of negligence in regard to the delay in the alleged diagnosis of adamantinoma in plaintiff's decedent's left femur.

117.   The standard of care to which defendant's physicians are held is measured by the degree of knowledge and skill of the physicians in good standing in New York City.  See Pike v. Honsinger, 155 N.Y. 201, 49 N.E. 760 (1898).

**B.   Damages Arising Out of a Prima Facie Case of Medical Malpractice Are Limited to 5 Months**

118.   Plaintiff did not meet her burden in establishing a *prima facie* case.

119.   Plaintiff's medical expert's opinion has not established that a standard of care in the community has been breached prior to August 20, 2002, or that there were any damages after January 29, 2003.

120.   Plaintiff has not presented credible evidence with a reasonable degree of medical certainty that negligence was more likely than not the cause of the need for the plaintiff's decedent to suffer from extensive femur surgery.  The testimony is clear that no damages arise out of the fact that the surgery was done five months later than would have been if the alleged radiological findings from the August 20, 2002, MRI of the hip had been reported.  These alleged injuries and damages were not proximately caused or contributed to by any negligence, wrongful act, or omission of any agent, servant or employee of the defendant.

121.   Plaintiff has not presented credible evidence with a reasonable degree of medical

28

certainty that negligence was more likely than not the cause of plaintiff's decedent having a significantly greater chance of tumor recurrence as a result of the alleged five month delay of diagnosis from August 2002 to January 2003. The testimony is clear that plaintiff's decedent did not suffer a recurrence due to any failure to meet the standard of care by defendant. These alleged injuries and damages were not proximately caused or contributed to by any negligence, wrongful act, or omission of any agent, servant or employee of the defendant.

122. The only injuries and damages, if any, properly awarded are for plaintiff's decedent's conscious pain and suffering and/or economic losses suffered by plaintiff's decedent during the five month time period from August 20, 2002, when further follow-up from the results of the MRI of plaintiff's decedent's left hip may have revealed the adamantinoma, to January 24, 2003, the date of the MRI of the left femur that revealed abnormalities that lead to further testing and a biopsy which resulted in the diagnosis of adamantinoma of the left femur.

123.    The Clerk of this Court shall enter judgment in favor of the United States dismissing the

action with respect to plaintiff's claim for damages for pain and suffering caused by delay

in diagnosis prior to August 20, 2002, and after January 29, 2003, and judgment and

damages shall only be awarded to plaintiff for pain and suffering for the five month

period from August 20, 2002, to January 29, 2003.


Dated:  Brooklyn, New York                          BENTON J. CAMPBELL
        March 16, 2009                              United States Attorney
                                                    Eastern District of New York
                                                    271 Cadman Plaza East, 7th Floor
                                                    Brooklyn, NY 11201

                                        By:
                                                    /s/
                                                    ORELIA E. MERCHANT (OEM 1717)
                                                    CHARLES P. KELLY (CK 6127)
                                                    Assistant United States Attorneys
                                                    (718) 254-7000


cc:     VIA ECF & HAND DELIVERY
        Jason Marc Rubin, Esq.
        Wingate, Russotti, & Shapiro LLP
        420 Lexington Avenue
        Suite 2750
        New York, NY 10170