UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

DOROTHY TESTAVERDE, as
Administratrix of the Estate of Alonzo
Testaverde, deceased                                    05-CV-2642 (ARR)

                            Plaintiff,

-against                                                ORDER AND OPINION

                                                        NOT FOR PRINT OR
                                                        ELECTRONIC
                                                        PUBLICATION


UNITED STATES OF AMERICA,

                            Defendant.
-----------------------------------------------------------------------X

ROSS, United States District Judge:


        Plaintiff, Dorothy Testaverde, as Administratrix of the Estate of Alonzo Testaverde, filed

this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, to

recover damages against the United States for delay in diagnosing decedent's femoral bone

tumor.[1] Specifically, plaintiff contends that the delay in diagnosis prolonged decedent's pain and

suffering, and resulted in "more extensive resection surgery" and a "recurrence of the cancer and

need for treatment of the recurrence." Pl's Proposed Findings of Fact and Conclusions of Law,

at 10-11. This court presided over a bench trial between April 14, 2009 and April 16, 2009.

---

[1] Decedent died on May 9, 2004 of a heart attack unrelated to his bone cancer. See Def's
Proposed Findings of Fact and Conclusions of Law, ¶ 77. While plaintiff initially included a
wrongful death claim in her complaint, she thereafter voluntarily dismissed, with prejudice, any
claim against the United States for wrongful death. See Stipulation and Order of Partial
Dismissal, June 29, 2007 (Dkt. No. 25).

1

Having reviewed the testimony and the parties' submissions, the foregoing constitutes this court's Findings of Facts and Conclusions of Law, pursuant to Fed. R. Civ. P. 52. For the reasons below, the court awards $386,500 to plaintiff.[2]

## FINDINGS OF FACT

Decedent, Alonzo Joseph Testaverde, was born on February 7, 1931. Tr. 36. Until he retired, he owned a pizzeria and lived in Brooklyn. Tr. 38. He was married to his first wife for 37 years, and after a brief second marriage, he resumed his relationship with his first wife. Tr. 39. He was a veteran of the United States Army and had two daughters and one son. Tr. 95-96.

A. Summary of Medical Visits: February 2001 Through March 2002

On February 28, 2001, Mr. Testaverde visited the Veterans Administration ("VA") Hospital's Primary Care Clinic ("PCC") in Brooklyn, complaining of left hip pain with weight bearing, that was exacerbated by extension and internal rotation. Joint Ex. ("J.E.") 2008. On March 3, 2001, Mr. Testaverde visited the Brooklyn VA Hospital's emergency room, wherein he complained of left hip pain and difficulty lifting his leg. J.E. 2017. On April 9, 2001, Mr. Testaverde was seen at the ER of the Brooklyn VA. J.E. 2020-21. He complained of pain in the groin area of his left leg. Id. He was noted to have chronic pain and a hip x-ray was taken, which noted no acute pathology. J.E. 2021. He was prescribed Tramadol. Id. Mr. Testaverde visited the Emergency Room on May 6, 2001, complaining of persistent left groin strain following a recent fall. J.E. 2024-25.

---

[2] In their proposed joint pre-trial order, the parties stipulated that plaintiff's recovery, if any, would be limited to $1.5 million. See Proposed Joint Pre-Trial Order, June 20, 2008 (Dkt. No. 41).

On May 9, 2001, Mr. Testaverde visited the PCC and complained of pain in his left hip and groin, which he attributed a past fall. J.E. 2024-25. He was prescribed Motrin, which provided some limited relief. Id. It was during this visit that Mr. Testaverde was first ordered to undergo a neurological evaluation. Id. On May 11, 2001, Mr. Testaverde visited the VA Neurology Clinic, where he complained of pain and weakness in his left leg. J.E. 2028. He was diagnosed with sciatica and a lumbar herniation was deemed likely. Id. On June 14, 2001, the Neurology Clinic noted that the Magnetic Resonance Imaging ("MRI") revealed no disk herniation, stenosis, or nerve root encroachment. J.E. 2031.

On October 31, 2001, Mr. Testaverde once again visited the PCC. He presented with persistent pain in his left leg, radiating from his groin to his knee and vice versa. J.E. 2048. Mr. Testaverde noted that the pain was worse at night, and was relieved when he sat on a chair with his left buttock raised. Id. He also noted that Vioxx was no longer effective in relieving the pain. J.E. 2045. His medication was therefore changed, and a bone scan, as well as physical therapy, were recommended. J.E. 2048. A three-phase bone scan was performed on November 9, 2001. J.E. 1269. The scan revealed "increased radionuclide activity . . . in the left proximal femur just below the surgical neck extending distally." J.E. 2152. "Further radiological evaluation" was recommended "to rule out other etiology." Id. On November 26, 2001, Mr. Testaverde's treating physician, Dr. Pasquariello, called him to discuss the scan's results. J.E. 2049.

On a December 6, 2001 visit to the VA's Rehabilitation Clinic, Mr. Testaverde reported that his left hip pain was "excruciating" and "unpredictable." J.E. 2049. Mr. Testaverde placed his pain level as eight out of a possible ten at a December 14, 2001 appointment. J.E. 2052. During a December 19, 2001 visit at the PCC, Dr. Pasquariello reviewed the bone scan and

determined it to be non-diagnostic, concluding that "patient's symptoms [did not] correlate with readily identifiable etiology." J.E. 2054. In turn. Dr. Pasquariello ordered an MRI of decedent's hip to ascertain whether or not Mr. Testaverde had a small fracture precipitated by his prior fall. Id.

On January 13, 2002, Mr. Testaverde presented to the VA's Emergency Room and was admitted to the hospital the following day. J.E. 2054. Mr. Testaverde reported that his pain was unbearable, placing his level of discomfort at seven out of a possible ten. J.E. 2066. An MRI of Mr. Testaverde's hip was performed on January 14, 2002. J.E. 2070. The MRI revealed "marrow edema in [the] intertrochanteric area," which the report noted could have been attributed to an old fracture. J.E. 2072. The following day, Dr. Pasquariello reviewed the MRI, noting that Mr. Testaverde's pain was out of proportion to the physical findings. J.E. 2073. Dr. Pasquariello also noted Mr. Testaverde's increased anxiety over his pain, observing that decedent was fatigued and wan. Id. On January 17, 2002, the VA's Radiology Service produced a report based on the MRI, noting an "area of increase in signal at the distal part of the trochanteric and the subtrochanteric region of the femur on the left," which the report attributed to a likely old trauma. J.E. 2150. As per a stipulation, defendant's failure to properly record or report these abnormalities constituted a departure from the standard of care. See Proposed Joint Pre-Trial Order, June 20, 2008, at 4 (Dkt. No. 41).

On January 30, 2002, Mr. Testaverde was evaluated by the Rehumatology Clinic at the Brooklyn VA. J.E. 2097. There, he was diagnosed with bursitis and a steroid injection was administered by Dr. Lazaro. J.E. 2099. Dr. Lazaro noted, however, that Mr. Testaverde's symptoms "may not be due to [bursitis]," and concluded that he would administer the shot, continue physical therapy, and "see how he progresses." Id. At a February 14, 2002

appointment, Mr. Testaverde reported that the steroid injection relieved his pain somewhat, indicating that his pain level was reduced to two out of a possible ten. J.E. 2101-02. By March 19, 2002, however, the pain had returned, and the Rheumatology Clinic administered another steroid injection and prescribed Tramadol. J.E. 2112. On March 27, 2002, Mr. Testaverde reported that the Tramadol was ineffective in alleviating his pain. J.E. 2116. Mr. Testaverde thereafter consistently complained of pain to defendant through mid-April 2002. J.E. 2116-19.

B. <u>Summary of Medical Visits: April 2002 Through December 2003</u>

On April 15, 2002, Mr. Testaverde visited the VA's Emergency Room, complaining of back and hip pain. J.E. 2121. He weighed 169 pounds, and the attending nurse indicated that he was anxious. J.E. 2120-21. He was instructed to follow-up with his primary care physician. J.E. 2121. On April 17, 2002, during a telephone conversation with Dr. Pasquariello, Mr. Testaverde conveyed that the second steroid injection did not relieve his pain. J.E. 2122. Dr. Pasquariello also noted that decedent was intolerant of opiates, because he experienced several side-effects, including hallucination, confusion and nausea. <u>Id.</u> On April 30, 2002, Mr. Testaverde telephoned the VA Nurse Help Line complaining of back pain radiating through the groin to the leg and knee. J.E. 2128. On May 15, 2002, he reported his pain as seven on a ten point scale. J.E. 2131. Weighing 160 pounds, Mr. Testaverde had lost nine pounds in one month. J.E. 2132. He was, however, able to ambulate independently. He declined physical therapy because it had previously exacerbated his pain. J.E. 2143. Dr. Pasquariello prescribed a sleep aid to assist Mr. Testaverde with sleeping through the pain. J.E. 2135. On May 29, 2002, Mr. Testaverde complained that pain kept him from sleep for two days. J.E. 2138. In turn, Dr. Pasquariello prescribed a Lidocaine patch. J.E. 2139. During a May 29, 2002 visit to the VA Anticoagulation Clinic, Mr. Testaverde noted that the Lidocaine patch alleviated some of his pain. J.E. 2141.

On June 26, 2002, Mr. Testaverde stated to the Anticoagulation clinic: "I don't feel right, I get tired every little thing I do, it's like a big chore to me." J.E. 2146. On July 24, 2002, while visiting the VA Rheumatology clinic, Mr. Testaverde stated that his pain was a nine on a scale of ten, and that he was unable to sleep and in distress. J.E. 1622. On July 30, 2002, Mr. Testaverde reported a loss of appetite, resulting in a ten pound weight loss, and he noted that he was "feeling down." J.E. 1610. He also, however, noted some relief with pain medication. Id.

On August 20, 2002, another MRI was performed on Mr. Testaverde. J.E. 1904. The impression was no avascular necrosis in the right and left femoral heads. Id. Additionally, the report noted no marrow edema in the left femoral head, and stated that the trochanteric and subtrochanteric fracture had healed. Id. Per the parties' stipulation, defendant failed to record or report abnormalities on this radiological study, constituting a breach of the standard of care. See Proposed Joint Pre-Trial Order, June 20, 2008 (Dkt. No. 41). On August 22, 2002, Mr. Testaverde weighed 154 pounds and reported his pain as eight on a scale of ten. J.E. 1602.

On August 27, 2002, Mr. Testaverde had his initial consultation at the VA Anesthesiology Pain Management Clinic. J.E. 1586. At that visit, he reported his pain level as five. He described the quality of the pain as "shooting, stabbing, aching, burning, pressing," and "constant." Id. He indicated that walking exacerbated the pain. Mr. Testaverde described his sleep quality as poor, indicating that he slept two to three hours per night and one to two hours during the day. Id. At this time, he was taking two tablets of acetaminophen every four hours and using a five percent Lidocaine patch. J.E. 1590. He reported fever, night sweats, and more than a twenty pound weight loss over a two month period. J.E. 1592. Indeed, he weighed 140 pounds at this visit. J.E. 1594. His Karnofsky rating was 70, indicating that he could care for himself, but that he was unable to "carry on normal activity." J.E. 1596. Despite experiencing

hallucinations in the past, Mr. Testaverde agreed to take Oxycontin to relieve his pain. J.E. 1596-97. The next day, Mr. Testaverde rated his pain at level five and indicated that medication had little impact on his pain. J.E. 1584. On September 5, 2002, in addition to the Oxycontin, Mr. Testaverde was prescribed Percocet. J.E. 1580. On September 17, 2002, Mr. Testaverde underwent a steroid injection in the sacroliliac joint. J.E. 1566.

On September 24, 2002, Mr. Testaverde reported to the pain clinic that he was still in pain. Indeed, the clinic report noted that his pain had become "more prominent." J.E. 1562. He was continued on the Lidocaine patch. In addition, he was prescribed a 5/325 milligram dose of Oxycodone/Acetaminophen to take in addition to his other pain medications. J.E. 1562. Two days later, Mr. Testaverde reported that the Fentanyl Patch was not providing relief. J.E. 1554. Therefore, Oxycontin was added back into Mr. Testaverde's pain regimen. J.E. 1556. On October 8, 2002, Mr. Testaverde indicated that his pain was at a four to five level on a ten point scale. J.E. 1544. He stated that "he thinks about his pain a lot," and that the past two years of his life were a "waste." Id. Dr. Hedayatnia increased his Oxycontin dosage to 20 milligrams and indicated that he would consult a psychiatrist since Mr. Testaverde had a "depressive mood." J.E. 1546, 1516. Mr. Testaverde expressed apprehension about this high dosage, because when he was previously on a 20 milligram dose, he hallucinated "and at the middle of the night went for a car ride toward Westchester, where his daughter" lived. J.E. 1514. On October 17, 2002, Mr. Testaverde placed his pain level at four, and noted that his pain was constant and stabbing. J.E. 1520. He had additional steroid injections on October 17, 2002 and October 27, 2002. J.E. 1514-16, 1492-1496. On October 22, 2002, plaintiff reported his pain level as three, and indicated that his hip pain was constant and sharp. J.E. 1486. A few days later, Mr. Testaverde

telephoned the Nurse Help Line and reported that the Oxycodone was less effective at relieving his chronic pain. J.E. 1482.

On October 28, 2002, Mr. Testaverde underwent a psychosocial assessment. J.E. 1477. Mr. Testaverde reported that he was unable to sleep and that he "live[d] for taking his pain medication." Id. He noted that he spent much of his days "going back and forth to the hospital and doctors" and that he "[could not] do much due to the pain he is experiencing." J.E. 1479. Indeed, Mr. Testaverde indicated that because of his pain, he had lost interest in all activities and his pain caused him to believe that he was near death. Id. On October 31, 2002, Mr. Testaverde admitted that he needed help with depression. J.E. 1474. During a November 5, 2002 evaluation, Mr. Testaverde noted that he was in constant, unbearable pain that was not alleviated in a meaningful way with pain medication. J.E. 1458. He indicated that he slept approximately three hours per night and had lost interest in seeing his friends. Id. Rather, he preferred to stay home and recuperate. Id. Specifically, Mr. Testaverde stated:

> No appetite, not sleeping good, no interests. At my age, that's it. I am ready to go. . . . I don't want to end my life, but there is nothing I can do. . . . constantly getting worse. How can you put up with the pain? Oh, God, I can't take it anymore.

J.E. 1458. The evaluator noted that Mr. Testaverde was "thin" and "pale," and that his general attitude was "troubled." J.E. 1464. It was further noted that decedent's mood was "depressed" and "anxious." Id. The attending psychiatrist diagnosed Mr. Testaverde with Major Depression. J.E. 1466.

On November 21, 2002, Mr. Testaverde indicated that there was no improvement in his pain level. J.E. 1444. Shortly thereafter, Mr. Testaverde moved to Florida to live with his daughter.

8

C.  Summary of Medical Visits: January 2003 Through May 9, 2004

On January 9, 2003, Mr. Testaverde was referred by Dr. Nathaniel Lowen of the Pinecrest Rehabilitation Hospital, to Florida Back in Boca Raton. J.E. 3521. In the letter to Dr. Nicholas Dang referring decedent, Dr. Lowen noted that Mr. Testaverde's pain was sharp and constant, causing him poor sleep. Id. His walking was limited to approximately five to ten feet, and he was only able to ambulate from the couch to the bathroom. Id. Furthermore, Dr. Lowen noted that Mr. Testaverde described his legs as weak, forcing him to use a motorized wagon. Id. His weight had decreased to 126 pounds. J.E. 3522. On January 22, 2003, Dr. Lowen reviewed a January 19, 2003 MRI and concluded that there was no evidence of disk herniation. J.E. 3566. This, combined with "significant painful left femur without radiographic diagnosis" lead Dr. Lowed to suspect a potential left femur abnormality. J.E. 3566. In turn, he recommended an X-ray and MRI of the left femur.

Next, Mr. Testaverde was examined by Dr. Allaaddin Mollabashy on January 28, 2003, at the University of Miami Department of Orthopaedics & Rehabilitation. J.E. 3563. Dr. Mollabashy described Mr. Testaverde as having a 32 pound weight loss over the prior two years. J.E. 3561. Further, he noted that decedent was "emaciated" and "weak," and "ambulates with an extreme antalgic gait using walker assistance." J.E. 3559. Reviewing the radiographic tests, Dr. Mollabashy noted "a destructive lesion in the proximal medial left femoral diaphysis." Id. A three-phase bone scan revealed "increased scintigraphic uptake in the mid proximal femoral left diaphysis." Id. And an MRI revealed "a lesion in the medial aspect of the left proximal femoral metaphysic." Id. Based on reviewing these radiographs, Dr. Mollabashy rendered a differential diagnosis, which included "metastatic carcinoma, myeloma, and more remotely, adamantinoma."

Id. On February 6, 2003, Mr. Testaverde placed his pain level at five on a ten point scale. J.E. 3628.

Mr. Testaverde was admitted to Cedars Medical Center in Miami, Florida on February 17, 2003. J.E. 2266. An incisional biopsy was undertaken of the left femoral diaphysis. Id. A frozen section analysis revealed a malignant neoplasm. Id. On February 25, 2003, Dr. Mollabashy officially diagnosed a wheelchair bound Mr. Testaverde with adamantinoma of the left femur, a slow-growing bone cancer. J.E. 3557.

On March 3, 2003, decedent underwent an intercalary resection of the left femoral diaphysis and left femoral allograft reconstruction at Cedars Medical Center. J.E. 2955. Post-operatively, Mr. Testaverde became anemic, and was treated with blood transfusions. Id. A fall from his bed caused a hematoma, and any alteration in his mental status resolved during his post-operative recovery. Id. He was discharged on March 17, 2003. J.E. 220. During a March 24, 2003 follow-up appointment, Dr. Mollabashy noted that Mr. Testaverde was in "good spirits" and was "ambulating with walker assistance partial weight bearing." J.E. 3552. He was prescribed physical therapy. Id. After a March 31, 2003 consultation, Dr. Mollabashy remarked that Mr. Testaverde was doing well and was again in good spirits. J.E. 3554. As a result, Dr. Mollabashy increased the intensity of his physical therapy. Id. On April 7, 2003, Mr. Testaverde was discharged from the HCR Manor Care and his physical therapy regimen was increased to permit for 50 percent weight bearing. J.E. 3551. On May 5, 2003, Dr. Mollabashy noted that Mr. Testaverde was ambulating with 50 percent weight bearing and that his surgical wound was healed. J.E. 3550. In turn, the intensity of his physical therapy was increased. Id. By July 14, 2003, Mr. Testaverde was ambulating with a walker and reported only intermittent discomfort. J.E. 3549. On August 11, 2003, although Mr. Testaverde was ambulating, he

reported more pain along his left thigh. J.E. 3547. The radiographic evidence, however, did not reveal a recurrence of the adamantinoma. Id. By September 15, 2003, Mr. Testaverde walked with the assistance of a cane. J.E. 3546.

On October 16, 2003, Mr. Testaverde visited the Miami VA and complained of pain in his leg; he placed his level of pain at five out of a possible ten. J.E. 3613. Mr. Testaverde presented at the University Hospital of Miami with left leg pain in December 2003 and January 2004. J.E. 646-48. In March 2004, decedent was admitted to the University Hospital of Miami for a biopsy; a recurrence of the adamantinoma was subsequently diagnosed. J.E. 644-45. While awaiting surgery, on April 27, 2004, Mr. Testaverde was admitted to the Westchester Medical Center in New York with complaints of chest pain. On May 9, 2004, Mr. Testaverde died of a heart attack. J.E. 4059.

## CONCLUSIONS OF LAW

### I.    Burden of Proof

A federal court presiding over a FTCA claim must apply "the whole law of the State where the act or omission occurred." Richards v. U.S., 369 U.S. 1, 11 (1962); Bernard v. U.S., 25 F.2d 98, 102 (2d Cir. 1994) ("State law applied to a FTCA claim."). Under New York law, to establish a case of medical malpractice, a plaintiff must prove: "(1) the standard of care in the locality where the treatment occurred, (2) that the defendants breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury." See e.g., Berger v. Becker, 272 D.A.2d 565 (2d Dep't 2000); Matthews v. Malkus, 377 F.Supp.2d 350, 356 (S.D.N.Y. 2005) (noting that the "plaintiff must allege facts that show a departure from good and accepted medical practice"). The plaintiff must prove medical malpractice by a preponderance of the evidence. See Metzen v. U.S., 19 3d 795, 807 (2d Cir. 1994).

There are two concessions regarding breaches in the standard of care. First, the parties stipulate that that failure to report abnormalities on the January 14, 2002 radiological study constituted a breach of the standard of care. See Proposed Joint Pre-Trial Order, June 20, 2008 (Dkt. No. 41). While plaintiff contends that this is dispositive, defendant maintains that this breach was not the proximate cause of decedent's pain because "the likelihood of diagnosis of . . . [the] adamantinoma would not have necessarily been made any sooner given [decedent's] other symptoms and the rarity of adamantinoma." Def's Proposed Findings of Fact and Conclusions of Law, ¶ 82. Second, defendant conceded at trial that on April 17, 2002, Dr. Pasquariello's care fell below acceptable standards when she failed to revaluate her diagnosis and order additional radiological studies after decedent reported that the most recent steroid injection provided no relief. See Def's Post-Trial Letter from Def, April 23, 2009 (Dkt. No. 57), at 3 (hereinafter "Def's Post-Trial Letter").[3] Thus, from April 17, 2002 through the January 22, 2003, defendant concedes liability and the only issue this court must decide is the appropriate amount in damages. Defendant challenges any post-surgery liability. See Def's Post-Trial Letter, at 3. Therefore, the relevant time periods in the case can be broken down into three, distinct periods: (1) November 9, 2001 through April 16, 2002 (no concession on liability); (2) April 17, 2002 through January 22, 2003 (concession on liability; only issue before the court is calculation of damages); and (3) January 23, 2002 through May 9, 2004 (no concession on liability).[4]

---

[3] Initially, defendant's concession date was August 20, 2002. See Def's Proposed Findings of Fact and Conclusions of Law, ¶ 81. Defendant's own expert, however, testified that the breach occurred on April 17, 2002.

[4] While plaintiff initially stated that November 9, 2001 was the initial date defendant breached the standard of care, in post-trial submissions, plaintiff contended that February 28, 2001 was when the first breach occurred. Because this court holds that liability commenced on April 17, 2002, this discrepancy is immaterial.

## II.    Testimony of Medical Experts

Both parties called as experts accomplished physicians to support their respective theories of liability. Plaintiff called Dr. Herbert Hermele, a licensed orthopedic surgeon with approximately 40 years of experience. Tr. 129-30.   Defendant called Dr. John Healey, Chief of Orthopedic Surgery at Memorial Sloan Kettering and Professor of Orthopedics at the Weill-Cornell Medical School.  Tr. 280.  Both reviewed decedent's records before testifying and both were paid for their services.  The court will summarize the relevant portion of each physician's testimony in turn.

### A.  Dr. Hermele's Testimony

Dr. Hermele first reviewed decedent's November 2001 bone scan.  The bone scan report revealed a linear area of increased radionuclide activity in the left proximal femur below the surgical neck extending distally.  Tr. 143.  Dr. Hermele testified that the report noted that "[f]urther radiological evaluation is advised to rule out other etiology." Tr. 146.  Dr. Hermele interpreted this to mean that a CAT Scan or MRI would have been appropriate.  Tr. 147.  Dr. Hermele further testified that "rule out other etiology" meant that the increased activity "could represent an area of bone activity secondary to injury; but [the physician] couldn't say that with assurance, [s]o, '[r]ule out other etiology' means it could be something else like infection or tumor." Tr. 147.  Next, Dr. Hermele testified that in 2001, the standard of care would have been for the treating physician reviewing that radiology report to order a CAT scan or MRI.  Tr. 148. Indeed, Dr. Hermele noted "you're obliged to further investigate this area of abnormal tissue to identify it[;] that will give you . . . the diagnosis." Tr. 148.  Dr. Hermele contended that the entire femur should have been tested because the abnormal activity was extending distally, that is

downward. Tr. 148. Because Dr. Pasquariello ordered no further radiological examination of decedent's femur, Dr. Hermele opined that defendant departed from accepted medical practice. Tr. 151.[5]

Next, Dr. Hermele testified regarding the January 14, 2002 MRI. Tr. 157. Dr. Hermele testified, consistent with the stipulation, that the report failed to note an abnormal signal extending distally down the femur's shaft. Tr. 160. Dr. Hermele further testified that defendant committed an error when a fracture was noted in the report. Tr. 160-61. He concluded that ordering further radiological studies and a biopsy should have been the next step in diagnosis and if done, it would have revealed the adamantinoma. Tr. 167.

Next, Dr. Hermele testified regarding the effect the delay in diagnosing decedent's bone cancer had on decedent's surgery. Dr. Hermele noted that a resection of the femoral bone was appropriate. Tr. 176. He also noted that if a tumor has "already . . . eroded through the bone" into the surrounding soft tissue, "it extends the surgery, blood loss is greater, [and] time of surgery is greater. When all of those elements increase, then the complications of surgery become greater." Tr. 176. Dr. Hermele then testified that while the 2003 MRI revealed the tumor had invaded Mr. Testaverde's soft tissue, the January 2002 MRI did not depict the tumor breaking through the bone shaft into the soft tissue. Tr. 176. Dr. Hermele also admitted, however, that because the radiological study was performed in the "wrong place," i.e. the hip and not the femur, it was difficult for him to testify authoritatively as to whether or not the adamantinoma had spread beyond the confines of the femur. Tr. 174-76. Next, Dr. Hermele stated that when dealing with bone cancer, while it was always optimal to perform surgery as soon as possible, he could not say "with assurance" whether or not the more extensive surgery

---

[5] In fact, as noted below, Dr. Pasquariello did order an MRI of decedent's hip.

involving the resection of soft tissue increased decedent's recovery time. Tr. 177. He was, however, able to testify "within medical probability" that "if the surgery had been done in early '02 at the time of the first MRI and the adamantinoma was still confined to the femur, the surgery would have been technically easier." Tr. 188.

Dr. Hermele then testified about Mr. Testaverde's pain. First, Dr. Hermele averred that the tumor caused thigh pain, which in turn caused decedent to limp. Tr. 182. This back pain and gait disturbance, i.e. the "asymmetry or the unbalanced way in which [Mr. Testaverde] was walking and limping putting undue mechanical stress on a 70-year-old spine[,]" was caused by the tumor pain. Tr. 182-83. Dr. Hermele then testified within reasonable medical certainty that decedent's "thigh pain, groin pain, [and] buttock pain" were caused by his bone cancer. Tr. 184. Indeed, Dr. Hermele consistently testified that decedent's leg, back, and hip pain was caused by the adamantinoma. See Tr. 188-203. Dr. Hermele also opined that decedent's depression was caused by his chronic tumor pain. Tr. 222. Dr. Hermele noted that removing a tumor causes the pain associated with the tumor to disappear to a "very significant degree." Tr. 182. Thus, Dr. Hermele concluded that an earlier diagnosis would have curtailed decedent's pain. Tr. 222.[6]

Next, Dr. Hermele discussed decedent's trochanteric bursitis diagnosis. Dr. Hermele admitted that Mr. Testaverde's symptoms were consistent with trochanteric bursitis. Tr. 186, Indeed, on cross-examination, Dr. Hermele admitted that on January 30, 2002, Dr. Lazzaro palpated over decedent's trochanteric area to elicit pain, and that the reported tenderness was symptomatic of bursitis. Tr. 239-40. Dr. Hermele also admitted that the weeks of pain relief following the January 2002 steroid injection is consistent with a trochanteric bursitis diagnosis.

---

[6] Defendant's expert, Dr. Healey, testified that surgery removing the adamantinoma would have eliminated 100 percent of his tumor pain. Tr. 354.

Tr. 241-42. Still, Dr. Hermele maintained that given the totality of the symptoms, bursitis was an incorrect diagnosis. First, Dr. Hermele noted that the radiological studies failed to reveal evidence of trochanteric bursitis. Tr. 186. Furthermore, Dr. Hermele averred that multiple steroid injections failed to provide "a significant degree of pain relief" for a meaningful period of time. Tr. 186. Also, he noted that another indication that bursitis was an incorrect diagnosis was the persistent use of opiates "which [did] not fit the benign diagnosis of greater trochanteric bursitis." Tr. 186.

Finally, Dr. Hermele testified regarding Mr. Testaverde's post-operative state. Dr. Hermele testified that "the delay in diagnosis[] definitely had a negative effect on [Mr. Testaverde] as a person, his general strength, his ability to tolerate surgery and it made the surgery much more involved, more lengthy, more complicated than would have been the case if the diagnosis had been made." Tr. 232. Dr. Hermele was not able, however, to conclude to a reasonable degree of medical certainty that the delay in diagnosis caused an increase in the risk of the cancer's recurrence. Tr. 323. This is because adamantinoma's rarity necessarily means that the sample size of any longevity study would be so small that there are no reliable statistics on which he could base an expert opinion. Tr. 233.[7]

In sum, Dr. Hermele testified that the tumor was present on decedent's radiographic studies, and because those studies were misread, no further imaging or investigation was undertaken, resulting in a delay in diagnosis. Dr. Hermele also noted that bone cancer was never

---

[7] Dr. Hermele went on to note that adamantinoma's rarity would have no effect of defendant's ability to diagnose decedent with bone cancer, since the specific type of bone cancer is revealed post-surgery. Tr. 233-34. Put another way, that Mr. Testaverde's bone cancer ultimately was adamantinoma is irrelevant to whether or not defendant breached the standard of care when it failed to diagnose cancer in general. Indeed, defendant's own witness testified that adamantinoma's rarity would not affect whether or not proper interpretations of radiological studies would have revealed abnormalities, leading to a diagnosis of generic cancer. Tr. 349.

included in defendant's differential diagnosis. Tr. 231. Thus, Dr. Hermele asserted that this represented a departure from medical standards and that this delay prolonged decedent's pain and increased the complexity of his surgery.

B. Dr. Healey's Testimony

Dr. Healey testified that the care rendered to Mr. Testaverde by defendant prior to April 17, 2002 was within the standard of care. He based this conclusion on the medical record and the imaging studies he reviewed, noting that "the record indicated a responsive and very reasonable approach to the patient's complaints." Tr. 298. First, Dr. Healey testified specifically about the January 14, 2002 MRI. Having reviewed slide 65 of the MRI, Dr. Healey opined that the increased area of white in the femur corresponded to edema, i.e. water, triggered by various causes, including trauma. Tr. 201-02. This was consistent with decedent's clinical history, which included a fall approximately ten months prior to the bone scan. Dr. Healey further testified that marrow edema is "characteristic of stress fracture . . . . that [marrow edema] will last for a considerable period of time." Tr. 304. Thus, Dr. Healey concluded that it was within the reasonable standard of care for the reviewing physician to view the edema as residual to a stress fracture decedent incurred from his prior fall. Based on the MRI, Dr. Healey testified that clinical follow-up in four to six weeks would have also been within the standard of care. Tr. 305. Importantly, he did not think that the MRI would have prompted any specific intervention. Tr. 305-06.

On cross-examination, however, Dr. Healey admitted that slide 65 also revealed an "increased signal in the cast of the femur[,]" that was separate and apart from the marrow edema. Tr. 334. As noted earlier, defendant stipulated that the failure to report this area of activity constituted a departure from the standard of care. Dr. Healey testified, however, that had the

17

abnormality been reported, the standard of care would not have required further radiologic evaluation of the entire femur. Tr. 335. Rather, he testified that it would have been good practice to follow-up with decedent in approximately six to eight weeks, and then perhaps order additional radiologic studies. Tr. 344-45.

On cross-examination, Dr. Healey was then queried as to whether Dr. Pasquariello's decision to ignore the radiologist who performed the November 2001 bone scan's recommendation to perform further radiological studies constituted a departure from accepted medical practice. Tr. 328. He testified that for an internist, it would "generally" have been good medical practice to follow the recommendation of the radiologist. Tr. 329. He also testified, however, that the tumor was not visible on the bone scan. Tr. 311, 348. Dr. Healey later testified that the bone scan was what prompted Dr. Pasquariello to order the targeted, January 2002 MRI of decedent's left hip. Tr. 374, 399. Dr. Healey did not think, however, that Dr. Pasquariello's failure to order an MRI of the entire femur constituted a departure from accepted medical standards. Tr. 400. To the contrary, according to Dr. Healey, Dr. Pasquariello's treatment fell within the standard of care. Tr. 374.

Dr. Healey also noted that a steroid injection administered to decedent on January 30, 2002 provided six to seven weeks of relief. Tr. 317. This result, Dr. Healey asserted, was consistent with a diagnosis of trochanteric bursitis. Tr. 317. He then went on to testify that he believed Mr. Testaverde had both trochanteric bursitis and adamantinoma. Tr. 317-18. In Mr. Testaverde's case, because decedent experienced pain relief after the steroid injection, Dr. Healey testified that he would not have ordered further radiologic studies immediately after the January 2002 MRI. Tr. 345. Indeed, Dr. Healey testified that until decedent complained of a recurrence of his pain on March 19, 2002, a diagnosis of trochanteric bursitis met the standard of

care. Tr. 375. Dr. Healey based this on the "physical examination findings, in January and again ... in March ... the point tenderness of the area, and then the specific response to the injection, [which] gave not just immediate relief, but some persistent relief." Tr. 375.

After Mr. Testaverde complained of sciatic pain on March 19, 2002, he received another steroid injection. Dr. Healey testified that this treatment was also within the standard of care. Tr. 376. Dr. Healey further testified that after this injection, it would have been within the reasonable standard of care for defendant to follow-up in six to eight weeks to ascertain what effect this injection had on decedent. Tr. 377. Thus, Dr. Healey noted that approximately three months after the late January 2002 injection, and six to eight weeks after the March 17, 2002 injection, follow-up was necessary. Tr. 346-47, 376-78. Thus, when a progress note, dated April 17, 2002 memorializing a telephone conversation with Mr. Testaverde, indicated that the latest steroid injection provided decedent with no pain relief, Dr. Healey testified that ordering additional radiological imaging would have been within the standard of care. Tr. 381-83. Indeed, Dr. Healey testified that in failing to order additional radiological studies, defendant's care fell below the accepted standard. Tr. 383.

Dr. Healey also testified that Mr. Testaverde's treatment, prognosis and oncologic outcome would have been the same if his bone cancer was diagnosed earlier. Tr. 309. He did admit, however, that the size of the tumor effected how much of the femur and surrounding tissue had to be removed. Tr. 310. And therefore, the delay in diagnosis may have impacted how much of decedent's femur and soft tissue had to be removed. Tr. 310. Dr. Healey was not able to testify as to whether that was so in Mr. Testaverde's case, however, because he contended that the full extent of the tumor was not identifiable at the time of the November 2001 bone scan or the January 2002 MRI. Tr. 310. He did note, however, that because the delay permitted the

19

tumor to grow, albeit slowly, Mr. Testaverde required a larger incision and lost more muscle than he would have had the surgery had been performed earlier. Tr. 360. Dr. Healey also testified that as a result of the delay in diagnosis, Mr. Testaverde was weaker than he would have otherwise been when he had the surgery. Tr. 313, 361. Dr. Healey surmised that his weakness, combined with decedent's 35 pound weight loss, "was probably a greater challenge in his recovery period." Tr. 313.

Finally, Dr. Healey testified that Mr. Testaverde's tumor was a factor in his loss of sleep, loss of appetite, and caused him to remain on opiates. Tr. 393. Dr. Healey also admitted that the side effects from the medicine and the tumor pain were prolonged because of the delay in diagnosis. Tr. 393. Dr. Healey further testified that Mr. Testaverde's return to full strength post-surgery was affected by the delay in diagnosing the tumor. Tr. 395.

## III.    Analysis

As noted above, there are three distinct time periods with which the court must contend: (1) November 9, 2001 through April 16, 2002 (no concession on liability); (2) April 17, 2002 through January 22, 2003 (concession on liability; only issue before the court is calculation of damages); and (3) January 23, 2002 through May 9, 2004 (no concession on liability). With respect to the pre-concession period, the parties' experts essentially contradicted each other. Dr. Hermele testified that the tumor was visible on the November 9, 2001 bone scan and that the standard of care required further radiological studies of the femur. Dr. Healey, on the other hand, testified that the tumor was not visible on the November 2001 bone scan, and that ordering a MRI of the hip was within the standard of care because a possible hip fracture was consistent with decedent's clinical history. Thus, the expert's testimony is at odds. And the court finds itself in a quandary because both experts were very knowledgeable and credible. That being so,

the court cannot say that plaintiff proved by a preponderance of the evidence that defendant's care fell below the acceptable standard.

The court reaches a similar conclusion with respect to the interpretation of the January 2002 MRI. As noted, defendant stipulated that the failure to properly record or report these abnormalities constituted a departure from the standard of care. Defendant maintains, however, that this departure was not the proximate cause of decedent's pain because even if the abnormality had been properly reported, the standard of care would not have mandated further radiological study at that time. Rather, per Dr. Healey's testimony, based on decedent's clinical history, Dr. Pasquariello's decision to administer a steroid injection to treat trochanteric bursitis was within the standard of care. Once again, Dr. Hermele disagrees. And once again, the court finds both expert's credible. As such, the court concludes that plaintiff has failed to meet her burden.

Next, Dr. Healey testified that defendant acted within the reasonable standard of care when Dr. Pasquariello administered a second steroid injection in March 2002. This is because the relief the January 2002 steroid injection provided to decedent confirmed Dr. Pasquariello's bursitis diagnoses. Therefore, once the pain recurred, it was acceptable for decedent to administer a second shot. Dr. Healey conceded, however, that once Mr. Testaverde reported on April 17, 2002 that the second shot provided no relief, the reasonable standard of care required a re-evaluation of the diagnosis and further radiological studies. Because Dr. Pasquariello failed to do so, defendant breached the standard of care. The court credits Dr. Healey's testimony and concludes that defendant breached the standard of care beginning on April 17, 2002, and this breach resulted in a delayed diagnosis of decedent's bone cancer. The court further concludes

that the breach was the proximate cause of plaintiff's pain and suffering. Thus, defendant is liable for damages for the entire concession period and through the date of decedent's resection.

Both experts also agreed that the delay in diagnosis and the pain associated with the tumor was the proximate cause of decedent's 35 pound weight loss, lack of sleep, and overall deterioration. Dr. Healey also conceded, consistent with Dr. Hermele's testimony, that as a result of the delay in diagnosis, Mr. Testaverde was weaker than he would have otherwise been if he had the surgery earlier, and decedent therefore faced a greater challenge during his recovery. Indeed, although conceding that adamantinoma is a slow-growing cancer, Dr. Hermele testified that the delay in diagnosis permitted the tumor to grow, resulting in more extensive surgery than would have otherwise been necessary had the tumor been diagnosed earlier. This also affected Mr. Testaverde's recovery. Neither expert, however, was able to testify to a reasonable degree of medical certainty that the delay in diagnosis caused the tumor to recur. Therefore, the court cannot conclude that defendant's breach caused decedent's recurrence of the cancer and need for treatment of that recurrence.

## IV. Damages

Having concluded defendant is liable for the period from April 17, 2002 through decedent's recovery from surgery, the court is now in the unenviable position of calculating damages. At the outset, the court notes that reaching a number amount in damages is an extremely difficult decision; yet, the court must quantify decedent's pain and suffering. The court is aided, however, by Mr. Testaverde's extensive medical records, which reveal decedent's self-reported level of pain and suffering.[8]

---

[8] The court also reviewed the testimony of decedent's daughters, Dorothy Testaverde and Mary-Anne Iuni. The court has not included that testimony in this Opinion and Order because it does

The court's award of $386,500 in damages reflects the severe pain suffered by decedent, which caused Mr. Testaverde to lose sleep, lose weight, and lose his ability to enjoy life. And while the court is cognizant that Mr. Testaverde's pain ebbed and flowed, the record illustrates that Mr. Testaverde, a once vibrant man, was a shell of his normal self – physically, mentally, and emotionally – by the time the resection was performed in early March 2003. This award also reflects the court's determination that decedent's pain and suffering increased considerably as the tumor grew from April 17, 2002 through the date of his surgery. Therefore, the court increased the amount of damages to which plaintiff is entitled to mirror the marked increase in plaintiff's pain over time. This award also takes into consideration decedent's post-surgery recovery. Per defendant's own expert, had the tumor been removed earlier, Mr. Testaverde would not have been in such a weak state when he underwent the resection of his tumor. Therefore, the court included in its calculation additional money for decedent's post-surgical pain and suffering which was exacerbated by the delay in diagnosis. In total, the court awards plaintiff $386,500.

_____

not materially add to what was reported by decedent in his own words as reflected in the medical records.

## CONCLUSION

For the foregoing reasons, the court awards plaintiff $386,500 in damages. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

                                        s/ ARR
                                        _____
                                        Allyne R. Ross
                                        United States District Judge

Dated: May 26, 2009
Brooklyn, New York